In the Matter of JOHN E., Appellant, v JOHN DOE et al., Respondents.

Second Department, December 24, 1990

### APPEARANCES OF COUNSEL

*Jean M. Kestel (Barbara Ferrand Reilly* of counsel), for appellant.

*Frederick J. Magovern (Constance F. Roland* on the brief), for respondents.

### OPINION OF THE COURT

BROWN, J.

On this appeal we are asked to consider, in light of the

guideposts established by the Court of Appeals in *Matter of Raquel Marie X.* (76 NY2d 387, *cert denied sub nom. Robert C. v Miguel T.,* — US —, 111 S Ct 517), the circumstances under which a natural father, who is not married to his child's mother and who has not lived with the child or the child's mother for a continuous period of six months immediately preceding placement of the child for adoption *(see,* Domestic Relations Law § 111 [1] [e]), may prevent an adoption. We find that the natural father in this case has failed to establish that his interest in the child is deserving of constitutional protection. Accordingly, we conclude that his consent to the child's adoption is not required.

# I

In or about September 1986 the petitioner became involved in an extramarital affair with a married woman. At some point in the spring or summer of 1987, the woman learned that she had become pregnant. Initially, she and the petitioner intended to live together and raise the child, but in September of 1987 the woman left the petitioner and resumed living with her husband. The child, Daniel, was born on December 15, 1987, and was turned over to the respondents four days later as the result of a prearranged private adoption.

On January 27, 1988, the petitioner commenced a proceeding in Family Court in Sullivan County, where Daniel was born, seeking custody of the child. He also sought an order of filiation, as Daniel's birth certificate as filed indicated that the birth mother and her husband were his parents. Shortly thereafter, the petitioner moved to stay the adoption proceeding, pending in Rockland County, in light of his Sullivan County custody proceeding. Ultimately, the custody and paternity proceedings were transferred to Rockland County, where, in July of 1988, the adoption proceeding was stayed pending the petitioner's submission to a human leucocyte antigen (hereinafter HLA) test. After the results of that test were received, indicating the probability of the petitioner's paternity to be 99.93%, the respondents no longer pursued their claim that the petitioner lacked standing to seek custody of Daniel.

In May of 1989, following mental health evaluations, the Family Court, Rockland County, issued an order deferring determination of the respondents' motion to dismiss the cus-

tody proceeding "pending a full hearing by this court as to what constitutes the best interests of the infant whose adoption is at issue". That hearing commenced in June of 1989 and was concluded in October of 1989.

By decision and order dated November 17, 1989, the Family Court dismissed the custody petition and directed that the adoption proceed. The court, in compliance with the express provisions of Domestic Relations Law § 111 (1) (e) (which set forth the conditions that must be met before the consent of the natural father of an infant who is born out of wedlock and placed for adoption at under six months of age is required), and in a stated effort to foster the rearing of children in the context of a meaningful family relationship, concluded that the petitioner's consent for the adoption was not required and that the best interests of Daniel would be served by permitting him to remain with his prospective adoptive parents, with whom he had then been living for the first two years of his life. Upon reargument the court adhered to its original decision and this appeal ensued.

## II

Domestic Relations Law § 111 lists several categories of persons whose consent to an adoption is required. Paragraph (e) of subdivision (1) thereof provides that the consent of the father of a child born out of wedlock who is under the age of six months at the time he or she is placed for adoption is only required if: "(i) such father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption; and (ii) such father openly held himself out to be the father of such child during such period; and (iii) such father paid a fair and reasonable sum, in accordance with his means, for the medical, hospital and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child" (Domestic Relations Law § 111 [1] [e]). However, in *Matter of Raquel Marie X.* (76 NY2d 387, *cert denied sub nom. Robert C. v Miguel T.,* — US —, 111 S Ct 517, *supra),* which was decided subsequent to the Family Court's decision in this case and while this appeal was pending in this court, the Court of Appeals declared Domestic Relations Law § 111 (1) (e) to be unconstitutional. Specifically, the court found that the first clause thereof, which requires that the natural father live openly with the child's mother during the six months preced-

ing placement, neither furthers the State's interest in determining the existence of a significant parental concern for a relationship with the child, focusing as it does on the relationship between the parents, nor sufficiently protects the natural father's constitutional right to develop a qualifying relationship with the child. The court stated: "This is not to say that the unwed father's failure to form ties with his newborn child may not be sufficiently great to constitute a sort of waiver or abandonment that would give rise to a State interest in providing the child with a permanent, stable home through adoption, as well as an interest on the part of prospective adoptive parents who have committed themselves to the child. The unwed father's right is decidedly limited in duration. Nonetheless, a father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship" *(Matter of Raquel Marie X., supra,* at 403).

Although the Court of Appeals only considered the first clause of Domestic Relations Law § 111 (1) (e) to be constitutionally infirm, it nevertheless declared the entire paragraph unconstitutional, because "we know with certainty from the format of the existing statute as well as the contemporaneous expressions of intent that the Legislature would not have wished to have the unchallenged portions of the statute stand alone as the sole measure of an unwed father's commitment to the child, entitling him to veto an adoption" *(Matter of Raquel Marie X., supra,* at 406-407). Pending the enactment by the Legislature of a new statute to replace Domestic Relations Law § 111 (1) (e), the court promulgated the following "principles gleaned from the [United States] Supreme Court decisions, which define an unwed father's right to a continued parental relationship by his manifestation of parental responsibility" *(Matter of Raquel Marie X., supra,* at 408):

"In the case of newborn infants, we take this to mean that the qualifying interest of an unwed father requires a willingness himself to assume full custody of the child—not merely to block adoption by others. In this connection, any unfitness, or waiver or abandonment on the part of the father would be considered by the courts, as they would whenever custody is in issue *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543).

"An assertion of custody is not all that is required. The

Supreme Court's definition of an unwed father's qualifying interest recognizes as well the importance to the child, the State and all concerned that, to be sufficient, the manifestation of parental responsibility must be prompt. In reaching this determination, courts should give due weight to the remaining portions of Domestic Relations Law § 111 (1) (e), which were directed to that same objective and are unchallenged in this litigation. Perhaps most significantly, they establish the period in which the father's manifestation of responsibility for the child is to be assessed—the six continuing months immediately preceding the child's placement for adoption. The interim judicial evaluation of the unwed father's conduct in this key period may include such considerations as his public acknowledgment of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child" *(Matter of Raquel Marie X., supra,* at 408).

A review of the facts of the case before us in light of the principles set forth by the Court of Appeals in *Matter of Raquel Marie X. (supra)* leads us to conclude that the petitioner failed to establish that his consent to this adoption is required. Moreover, as the best interests of Daniel would clearly be served by permitting him to remain with the only parents he has known since his birth three years ago, we agree with the Family Court's determination that this adoption should be allowed to proceed *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543, *supra).*

Keeping in mind that the operative period is the six months prior to placement, in this case June through December of 1987, it appears that prior to September of 1987, the petitioner and the natural mother lived together. Apparently, it was during this period that the natural mother made her first visit to an obstetrician, a visit toward which the petitioner paid $100. Around Labor Day the natural mother told the petitioner that she had decided to return to her husband. According to the petitioner, during the over three-month period before Daniel's birth, he telephoned the natural mother "several times". He also intermittently checked on her progress by calling her sister. However, he did little more. The record discloses that the petitioner provided virtually no financial support during the operative time period, nor did he make any earnest effort to do so *(see,* Domestic Relations Law § 111 [1] [e]; *Matter of Raquel Marie X.,* 76 NY2d 387, 408,

*supra).* Moreover, the petitioner's lack of financial support continued following the child's birth.

In addition, the record is devoid of any indication that the petitioner publicly acknowledged his paternity during the six months preceding Daniel's placement for adoption. Nor does it appear that the petitioner took any steps whatever during this period to establish his legal responsibility for the child. In this regard, it should be noted that a proceeding to establish the paternity of a child may be brought during the pregnancy of the mother *(see,* Family Ct Act § 517).*

The petitioner's conduct is in sharp contrast to that of the biological father in *Matter of Baby Girl S.* (141 Misc 2d 905, *affd* 150 AD2d 993, *affd* 76 NY2d 387), the companion case of *Matter of Raquel Marie X.,* whose consent to adoption the court found to have been required. As soon as the biological father in *Matter of Baby Girl S.* learned that the child's mother, with whom he was having an extramarital affair, was pregnant, he sought to marry her *(see, Matter of Baby Girl S., supra,* at 908). He also offered her $8,000 to help pay for her expenses *(see, Matter of Baby Girl S., supra,* at 909). After being rebuked, he filed a petition to establish paternity and to obtain custody of the unborn child *(see, Matter of Baby Girl S., supra,* at 907). During the course of the proceeding, and unbeknownst to both him and the Family Court Judge, the biological mother gave birth to Baby Girl S. and consented to her prearranged adoption *(see, Matter of Baby Girl S., supra,* at 907). Upon learning of the proposed adoption, he immediately filed with the Putative Father Registry. There was, simultaneously, an adoption proceeding in Surrogate's Court, wherein the prospective adoptive parents, their attorney and the biological mother contrived to keep both the biological father and the Surrogate in the dark. It was on the basis of this evidence, evidence which is totally lacking here, that the

---

* It should also be noted that the fact that Daniel was in utero during practically all of the six months prior to his placement for adoption has little bearing on this analysis. In fact, the Legislature in enacting Domestic Relations Law § 111 (1) (e), and the Court of Appeals in deciding *Matter of Raquel Marie X.* were dealing with this precise situation, that is, the situation where the child in question is under the age of six months at the time he is placed for adoption *(see,* Domestic Relations Law § 111 [1] [e]; *Matter of Raquel Marie X.,* 76 NY2d 387, 399, 401). Moreover, the children at issue in *Matter of Raquel Marie X.* and its companion case *(Matter of Baby Girl S.,* 141 Misc 2d 905, *affd* 150 AD2d 993, *affd* 76 NY2d 387), were placed for adoption two months *(Matter of Raquel Marie X.)* and two days *(Matter of Baby Girl S.)* after their births.

court determined that the biological father "did everything possible to manifest and establish his parental responsibility" *(Matter of Raquel Marie X.,* 76 NY2d 387, 409, *supra),* by "seeking full custodial responsibility virtually from the time he learned of [the biological mother's] pregnancy" *(Matter of Raquel Marie X., supra,* at 409).

The petitioner's lack of manifestation of parental responsibility and commitment at bar, while at first blush perhaps somewhat puzzling in light of his subsequent effort to establish paternity and to prevent Daniel's adoption, is readily explained by an examination of the petitioner's hearing testimony. At the hearing, the petitioner made clear that he had no desire to take legal responsibility for or obtain custody of Daniel once the natural mother resumed residency with her husband. The petitioner was content to effectively waive his custodial rights and parental responsibilities as long as he believed that Daniel would be raised by his natural mother and her husband. It was not until he learned that Daniel had been placed for adoption by his natural mother that the petitioner sought to assert his parental rights (although, tellingly, he continued to abdicate any of his parental responsibilities). During his hearing testimony, the petitioner explained that he had been raised by foster parents, and although he had no regrets about the manner in which he was raised, he believed that a certain "bonding" occurs between a biological parent and a child which was important to the child's well-being. This, despite uncontroverted expert testimony that Daniel had already "bonded" with his adoptive parents, the respondents, and that to break this bond at that point in his young life would cause him irreparable injury. In view of this hearing testimony, and the fact that the petitioner was apparently uninterested in seeking custody of Daniel until he learned that his biological mother had placed him for adoption, we conclude that the petitioner's purported "qualifying interest" is nothing more than an effort to block Daniel's adoption by the respondents, whom he considers to be strangers, rather than to assume custody himself *(see, Matter of Raquel Marie X.,* 76 NY2d, at 408, *supra).*

A word about the nature of the custodial relationship sought by the petitioner is appropriate. The 48-year-old petitioner is employed full time and is unmarried, having been divorced from his wife during the pendency of these proceedings. He lives out of State with an adult daughter, who operates a day-care center from her home. According to the

petitioner, Daniel would be placed in this day-care center during most of his waking hours and, effectively, would be raised by the petitioner's daughter. Given the limited contact that the petitioner would have with Daniel if he were allowed to prevail, one cannot help but further question his motivation in seeking custody of Daniel.

The circumstances of this case lead us inexorably to the conclusion that the petitioner's manifestation of interest in his now three-year-old child—a child whom he has never known—was neither sufficiently prompt nor sufficiently substantial to require constitutional protection *(see, Matter of Raquel Marie X.,* 76 NY2d 397, 404, *supra),* and that, accordingly, his consent to the child's adoption is not required. The petitioner initially waived his right to custody of Daniel and did not "promptly avail * * * himself of all the possible mechanisms for forming a legal and emotional bond with his child" *(Matter of Raquel Marie X., supra,* at 402). In short, under the facts of this case, the petitioner's parental interest has been outweighed by "a State interest in providing the child with a permanent, stable home through adoption, as well as an interest on the part of prospective adoptive parents who have committed themselves to the child" *(Matter of Raquel Marie X., supra,* at 403).

## III

Having determined that the petitioner's consent to the adoption is not required, it must be determined whether it is in the best interests of Daniel to remain with the respondents *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543, 544, *supra).* Of this there can be little doubt. The uncontroverted expert testimony elicited at the Family Court hearing established that Daniel's interests will best be served by permitting him to remain with his adoptive parents. The adoptive father, a 36-year-old training specialist at the New York Power Authority, earns approximately $45,000 a year and works five days a week. His wife, a 37-year-old dental hygienist, works two days a week. A babysitter is employed to care for Daniel while the adoptive mother is at work. The respondents own a three-bedroom ranch style home in which Daniel, their only child, has his own bedroom and playroom. A fenced-in play area is provided for Daniel in the backyard, where there is also a fenced-in swimming pool. The respondents were described as well-prepared, involved parents. In the opinion of psychiatrist

Alan Tuckman, although Daniel would survive removal from those persons who have been his primary caretakers for his entire life, he would suffer serious emotional damage, particularly since he would be placed in the custody of someone who is unable to care for him on a full-time basis. Psychologist Bernard Schwartzberg found that "a warm, intimate bonding" had formed between Daniel and his adoptive parents, and that removal from their care would have "a devastating psychological effect" on Daniel. "[I]t would cause the development of what I would call basic anxiety in the child, which is a sense of feeling helpless and alone, feeling hostile. It would have consequences in the ability of the child to relate to people in a secure and meaningful manner and it might interfere with his potential".

In stark contrast, the 48-year-old petitioner could provide Daniel with little more than a biological parent. Full-time care of the child would be provided by the natural father's 23-year-old daughter, in a day-care setting in which she would also care for six other children. Doubtless, Daniel's best interests would be served by the respondents' continued custody (*see, Matter of Bennett v Jeffreys,* 40 NY2d 543, 551-552, *supra).*

IV

Even if we were not prepared to conclude that the evidence supports the conclusion that the petitioner's consent to Daniel's adoption is not required, we would still not be prepared to dismiss the adoption proceeding. As is evident from the Family Court's May 1989 order, the focus of the hearing held in this matter was in the context of Daniel's best interests, and was not directed at the issue of whether the petitioner's consent was required. Indeed, at the time of the Family Court hearing the law was such that all that was required to be established in order to determine that the petitioner's consent to the adoption was not required was that the petitioner had not lived with the natural mother for the six months preceding Daniel's birth. Thus the respondents had no reason to believe that it was necessary that they offer evidence of the petitioner's waiver or abandonment of his right to veto the adoption. Accordingly, if we did not find the evidence of the petitioner's waiver to be sufficiently clear on this record to meet the *Matter of Raquel Marie X.* guideposts, we would remit the matter for a new hearing at which the respondents would be given the opportunity to proffer such evidence.

Accordingly, the appeal from the order entered November 17, 1989, is dismissed, as that order was superseded by the order entered January 10, 1990, made upon reargument, and the order entered January 10, 1990, is affirmed, insofar as appealed from.

ROSENBLATT, J. (concurring in the result). I concur with the result reached by the plurality, but I feel that there are grounds for affirmance far stronger than the plurality's conclusions as to the level of the petitioner John E.'s fitness, and the promptness by which he asserted his claims. For that reason, I add the following by way of concurrence.

To begin with, I disagree with our dissenting colleague in his view that *Matter of Raquel Marie X.* (76 NY2d 387, *cert denied sub nom. Robert C. v Miguel T.,* — US —, 111 S Ct 517) compels us to order that the child be taken from the adoptive parents and given to the petitioner, the putative biological father.[1] I do not believe that *Matter of Raquel Marie X.* mandates any such result.

I recognize, of course, that virtually every contest between a biological parent and an adoptive parent touches the deepest emotions, and that in other instances when a biological parent prevails, as he or she often should and does, the adoptive parents are left with heartache, and the child is brought to a less familiar environment. Here we are presented with features that make the prospect of a custody shift all the more discomforting.

Daniel, the subject of this proceeding, is now three years old. From the time he was four days old he has been under the care of his adoptive parents, the only parents he has ever known. In abundance, they have given him parental love, physical comfort, and emotional security. According to the uniform expert testimony and the Family Court, the shift in custody carries with it potentially devastating emotional consequences for Daniel.

Moreover, the birth mother willingly put the child up for adoption, and has not altered her position. Daniel was conceived as a result of her extramarital affair with the petitioner, who at the time the child was conceived and born was also married to someone else. The birth mother has gone back to her husband, whose name appears on Daniel's birth certifi-

---

1. No order of filiation has been signed. Because the parties seem to have assumed that the petitioner is the biological father, based on the results of a blood test, I will refer to him hereafter as the biological father.

cate, and who also supports the adoption. The petitioner, who is 48 years old, has since been divorced and lives with his 23-year-old daughter, who is engaged in Pennsylvania in providing day care services for 6 or 7 children.

From his union with his former wife, the petitioner has two other sons, one of whom is also grown. In that breakup, the petitioner, interestingly, agreed to give custody of the other son, a teen-ager, to his former wife. In pressing his claim for Daniel, whom he has never seen, the petitioner stated that because he works during the daytime, he would place Daniel in child care under his daughter's aegis.

The adoptive parents have had Daniel practically since birth. They wanted him, planning their lives and preparing their home for his arrival under the belief and the wholly reasonable expectation that they would raise him as their child.

A change in custody would entail not only severe adversity for Daniel, but the bitterest of ironies. The adoptive parents took Daniel on December 19, 1987, when Domestic Relations Law § 111 gave the petitioner no right to veto the proposed adoption. During the litigation the parties and the Family Court Judge proceeded on the basis that Domestic Relations Law § 111 had a requirement that the petitioner could not meet, notably, that a biological father, to gain standing to veto a proposed adoption, must have lived openly with the birth mother for six months before the child's placement for adoption (see, Domestic Relations Law § 111 [1] [e]).

On July 10, 1990, several months after the Family Court ruled in favor of the adoptive parents, the Court of Appeals, in *Matter of Raquel Marie X. (supra)*, held the six-month requirement of Domestic Relations Law § 111 (1) (e) unconstitutional. At the Family Court proceedings in the case before us, neither the parties nor the court had addressed the constitutionality of the six-month requirement. Even in his appellate brief, which he filed before *Matter of Raquel Marie X.* was decided, the petitioner argued due process, equal protection, and his justification for noncompliance with Domestic Relations Law § 111 (1) (e), but did not, until oral argument of this appeal, make the constitutional challenge that formed the basis for the decision in *Matter of Raquel Marie X.* Nevertheless, he now invokes *Matter of Raquel Marie X.*, an unrelated case involving similar but not identical considerations, to pull the rug out from under the adoptive parents, and Daniel stands to be grievously injured in the process, as well.

The application of the rule in *Matter of Raquel Marie X.* to future cases is a cogent acknowledgment of an important "liberty" interest of biological fathers *(see, Lehr v Robertson,* 463 US 248, 257; *Michael H. v Gerald D.,* 491 US 110, 109 S Ct 2333). It furthers paternal responsibility by placing paternal biological ties on a constitutional level, and invokes valued equal protection concepts. It stands to work well when people are on notice as to its teachings, and when its compelling rationale is compatible with the facts. Here, it is a misfit.

The petitioner invokes *Matter of Raquel Marie X. (supra)* for the proposition that his biological "liberty" interest transcends the State's vital interest in assuring that the adoption process be free of the trepidation that inhibits qualified people from adopting children, and free of the uncertainties that threaten the security of adopted children.

*Matter of Raquel Marie X. (supra),* however, did not involve or address certain considerations that our case presents. First, there is what I would characterize as the fundamental interests of the *child.* I do not mean the conventional "best interests" test *(see, Friederwitzer v Friederwitzer,* 55 NY2d 89; *see also, Eschbach v Eschbach,* 56 NY2d 167), as employed by the Family Court and the plurality in this case. The "best interests" are typically at issue in custody disputes between mothers and fathers, and they frequently pose a choice between two environments (sometimes both good, sometimes varying). In our case, it is a different kind of choice, involving a wrenching uprooting that so palpably disserves Daniel, that it amounts to a denial of *his* constitutional right to liberty, on a scale certainly no less than the petitioner's asserted liberty interest. The petitioner can better survive defeat in this litigation than can Daniel.

The adoptive parents also vehemently argue that the petitioner should not be permitted to advance his claim of fatherhood in the context of a doubly adulterous relationship. Without placing the matter on moral grounds, it is enough to say that the petitioner, as a 45-year-old married adult, entered willingly into an extramarital affair with a married woman and had reason to know what could happen. Unlike Daniel, he is not innocent. Daniel, on the other hand, has had no say in any of this, and should not on this record be consigned to the consequences of the petitioner's biological claims.

The proof in this case unquestionably supports the conclusion, based upon the uncontradicted expert testimony, that

the change in custody portends disaster for Daniel. The psychologist who testified at the hearing spoke of the "devastating" psychological effects that await Daniel if his parental bond is to be exploded, while the psychiatrist described the "serious damage" facing Daniel, including the impairment of his cognitive and intellectual functions. This testimony bears repetition, but it takes no expert to recognize the manifest dangers to Daniel, and to recoil from the idea that such a result can somehow be compelled by law. The Department of Social Services strongly recommended against a change in custody, calling the prospect potentially injurious in the extreme. I cannot see how the "liberty interests" of this father, under the facts of this case, can prevail over Daniel's interest to grow up free of avoidable, severe emotional scarring. Under these circumstances I would count the child's interests and deprivation to be of constitutional dimensions. I do not view this as a choice between a cozy picket-fenced ranch house environment as against that of a middle-aged single parent of modest income. Were the situation reversed, with the biological father happily married and able to offer the child every possible comfort, the depersonalization of this child, and the destruction of a loving, parental bond, would be no less distressing.[2]

---

2. As we have observed, the petitioner has no order of filiation. Seeking one, he would delegitimize the child—a result which, under equitable estoppel principles, we found unacceptable in *Matter of Ettore I. v Angela D.* (127 AD2d 6; *see also, Purificati v Paricos,* 154 AD2d 360; *Matter of Campbell v Campbell,* 149 AD2d 866; *Matter of Sharon GG. v Duane HH.,* 95 AD2d 466, *affd* 63 NY2d 859) despite the results of an HLA test which disclosed a plausibility of paternity score of 99.82—a figure comparable to the petitioner's 99.93. Daniel was not born out of wedlock. He was born when his mother was married to her husband, whose name appears on Daniel's birth certificate, as Daniel's father. In *Matter of Raquel Marie X.* (76 NY2d 387), both the birth mother and the biological father were unwed, and there was therefore no prospect as there is here, of a child born in wedlock being delegitimized. Indeed, in *Matter of Raquel Marie X.,* the very opposite took place. There, the biological parents, both of whom were married to no one at the time of the child's conception and birth, had "reunited," and together they supported the biological father's position. The same was true in the companion case, *Matter of Baby Girl S.* (141 Misc 2d 905, *affd* 150 AD2d 993, *affd* 76 NY2d 387). I recognize that the question of legitimacy was not considered, and certainly not of pivotal concern in *Matter of Raquel Marie X.* and *Matter of Baby Girl S.,* but I know of no case —and can imagine none—in which a court has delegitimized a child, wrenched him from his home and family, and seriously jeopardized his emotional well-being in the name of someone else's rights that were not proffered at the time the child, under then-valid law, was properly placed in
*(n. cont'd)*

The reach of *Matter of Raquel Marie X. (supra)* is debatable enough to have occasioned a dissent in this court. If *Matter of Raquel Marie X.* had been decided before Daniel's conception (or if Domestic Relations Law § 111 [1] [e] had never been enacted), the Family Court, were it of the same view as the dissent, might have immediately given Daniel over to his biological father. No bond of any duration would have developed between Daniel and his adoptive parents, certainly not the powerful three-year tie that has been forged.[3] But while the petitioner may claim that he should have had the child from the outset and is not accountable for the law's delay, Daniel is utterly blameless. As between Daniel and the petitioner, the consequences of that delay and of the unconstitutionality of Domestic Relations Law § 111 (1) (e) should not be visited on the child, so as to reduce him to a biological chattel. All of the unique and remarkable features of this case combine to create a set of extraordinary circumstances such as to militate against a change in custody *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543).

The bond between Daniel and his adoptive parents was created by law, in faithful reliance on law and, with the final order of the Family Court Judge, was ratified by law. No one at the Family Court stage expressed doubts as to the constitutionality of Domestic Relations Law § 111 (1) (e). Accordingly, when a statute is declared unconstitutional, there is room to withhold retroactive application where there has been good-faith reliance on the statute, coupled with a demonstrably inequitable result *(see, Lemon v Kurtzman,* 411 US 192; *Matter of Cahill v Public Serv. Commn.,* 147 AD2d 49, *affd* 76 NY2d 102).

This issue was not addressed in *Matter of Raquel Marie X. (supra),* but it is difficult to imagine a more unconscionable result than the prospect of telling Daniel, that even though all was originally proper in law, somehow a mistake has been made, and he must be taken forever from his parents.[4]

---

an adoptive home. A reversal would mark Daniel as the first child to be so treated.

3. Indeed, protracted separation between natural parent and child, and the child's attachment to the custodian, have been considered "extraordinary circumstances" supporting a court's determination to deny the natural parent custody of the child *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543; *Matter of Michael Paul T. v Thomas R.,* 124 AD2d 970).

4. I also note that no Law Guardian has been appointed to represent Daniel's interest. Surely, no challenge to a child's legitimacy (and with it,

*(n. cont'd)*

Apart from the respective constitutional interests here at stake, there is the State's interest. The facts of this case suggest that we view the State's interest somewhat differently than in *Matter of Raquel Marie X. (supra)*. Here, we cannot put this societal interest on any one side of the equation. Daniel has a unique interest, different from his adoptive parents, and different from that of his biological father. Moreover, society has an interest in what happens to Daniel. The State also has an interest in encouraging proper adoptions, but on the biological father's side we have a collective interest in encouraging individual, paternal rights, because with them go paternal responsibilities, and, in turn, enhanced domestic stability.

In *Matter of Raquel Marie X. (supra)* and in the companion case of *Matter of Baby Girl S.* (141 Misc 2d 905, *affd* 150 AD2d 993, *affd* 76 NY2d 387), both fathers were unwed and had sired children of unwed mothers. Although the holding did not turn on that feature, I take it to have been of more than passing concern. The societal interest in *Matter of Raquel Marie X.* and *Matter of Baby Girl S.* conjoined with the "liberty interests" of the biological fathers, at least insofar as there is a societal interest in unwed fathers acknowledging their paternity. The recognition of those paternal rights carries benefits that society reaps when unwed fathers, invoking biological rights, undertake the responsibilities that go with those rights. To the extent that *Matter of Raquel Marie X.* and *Matter of Baby Girl S.* include those considerations, they are entirely lacking here. Beyond the petitioner's interests, there is absolutely nothing to justify the incalculable harm to

custodial fate) should ever succeed with no one representing the child's interest. To even contemplate an order of filiation, which is to say, bastardization, with no representation for Daniel, would amount to a condition in which the child's rights are not being adequately protected, insofar as the efficacy or accuracy of the blood test is concerned, to say nothing of the question of custody in the context of a proposed order of filiation *(see, Johannessen v Johannessen*, 148 AD2d 895). In this instance, however, the appointment of a Law Guardian is unnecessary, in light of the plurality's determination that Daniel's best interests are overwhelmingly satisfied by leaving him with the adoptive parents. Assuming that the blood test results could not be faulted, despite any potential challenge by any Law Guardian, the plurality result, which assumes the accuracy of the blood test, fully protects the child's interests by preserving his legitimacy, his home, and his relationship with the only parents he has ever known. To remit the matter for appointment of a Law Guardian at this stage would severely prejudice the child's interest, and protract the litigation needlessly.

this child that would flow from a reversal of the Family Court order.

THOMPSON, J. P. (dissenting). I vote to reverse the order entered January 10, 1990 and to reinstate and grant the petition to stay the adoption proceedings.

I have no quarrel with the strong emotional appeal of the position adopted by the plurality which accords priority in these proceedings to the adoptive parents as being the more fit to raise the child Daniel. However, I find that the plurality decision raises disturbing questions about the nature of an unwed father's right to consent to an adoption and when and under what circumstances a court has the authority to deprive an unwed father of the right to raise his out-of-wedlock child because it believes the prospective adoptive parents possess a superior ability to provide a nuturing home environment for the child. The concurring opinion purports to bypass the two-pronged analysis adopted by the plurality in favor of a constitutional analysis balancing the child's right to liberty against the natural father's liberty interests. Because I believe that both approaches run contrary to the criteria established in *Matter of Raquel Marie X.* (76 NY2d 387, 408, *cert denied sub nom. Robert C. v Miguel T.,* — US —, 111 S Ct 517) for determining an unwed father's right to custody of his child, I dissent.

The factual background of this matter has been detailed at length in the plurality and concurring opinions and will not be repeated here except as necessary to illustrate my position. At the outset, I would emphasize that the petitioner's paternity of Daniel is not disputed notwithstanding that the child was conceived as a result of an adulterous relationship between his biological mother and the petitioner and no order of filiation was ever entered. The results of an HLA test indicated the likelihood of paternity for the petitioner to be 99.93%. In light of our holdings that an HLA test "is highly accurate on the issue of paternity" *(Matter of Karen K. v Christopher D.,* 86 AD2d 633, 634; *see, Matter of Denise H. v John C.,* 130 AD2d 748; *Matter of Constance G. v Herbert Lewis L.,* 119 AD2d 209, 212), any effort to rely on the presumption of legitimacy would likely have been defeated *(see, Matter of Constance G. v Herbert Lewis L., supra).* In any event, the biological mother acknowledged the petitioner to be the father of the child.

Until the Legislature sees fit to enact a replacement statute

for Domestic Relations Law § 111 (1) (e) which the Court of Appeals in *Matter of Raquel Marie X. (supra)* declared unconstitutional, we are bound to apply the criteria adopted in that case "which define an unwed father's right to a continued parental relationship by his manifestation of parental responsibility" *(Matter of Raquel Marie X., supra,* at 408). The prompt manifestation of parental responsibility is essential with the operative period being the six months immediately preceding the child's placement for adoption. Factors which the court identified as relevant to an evaluation of the unwed father's conduct during the requisite six-month period included the unwed father's "public acknowledgment of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child" *(Matter of Raquel Marie X., supra,* at 408). Clearly, the Court of Appeals did not intend this list to be definitive as evidenced by its use of the catch-all phrase "other factors". Rather the question of whether or not the biological father's consent to the adoption is required must be approached on a case-by-case basis. The court provided the following amplification of the concerns relevant to the veto power of the natural father over a newborn child's adoption by strangers: "[T]he qualifying interest of an unwed father requires a willingness himself to assume full custody of the child—not merely to block adoption by others. In this connection, any unfitness, or waiver or abandonment on the part of the father would be considered by the courts, as they would whenever custody is in issue *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543)" *(Matter of Raquel Marie X., supra,* at 408). The plurality opinion concluded that in the operative six-month period the petitioner failed to establish the requisite parental responsibility and engaged in this litigation solely in an effort to block the adoption of Daniel rather than out of a sincere desire to assume full custody of the child. This conclusion is based upon a tortured reading of the hearing testimony. In my opinion the record reflects a clearly expressed willingness on the petitioner's part to assume the full custodial responsibilities and not that his efforts were motivated by a desire merely to impede or hinder the adoptive process.

The mere fact that the biological mother was married to another man when the child was conceived is not dispositive. There are circumstances where the rights of the unwed father are comparable to those of the married father *(see, Michael H. v Gerald D.,* 491 US 110, 109 S Ct 2333). I believe, however,

that this matter is complicated by the fact that the child was conceived during a period when the biological mother was separated from her husband and living with the petitioner. The biological mother and her husband subsequently reconciled about three months prior to Daniel's birth. This reconciliation was apparently prompted by the biological mother's concern about the well-being of her teen-aged son, who remained with her estranged husband. During the initial stages of the reconciliation the biological mother maintained contact with the petitioner, fully acknowledged his paternity of the unborn child, and professed her love for the petitioner and her desire that they be reunited. Thus, it is reasonable to assume that the petitioner did not inject himself into the biological mother's marital relationship but rather trusted that she would resolve the matter of the custody of her teen-aged son and return to him to give birth to their child. Any interference by the petitioner may well have placed such arrangements in jeopardy. Thus, contrary to the suggestion in the plurality opinion, a legitimate reason exists for the petitioner's delay in seeking custody of the then-unborn child.

At some point after the biological mother's return to her husband, she told the petitioner that she had changed her mind about reuniting with him, and indicated that the petitioner was not the father of the unborn child and that she no longer wanted to speak to him. In his hearing testimony, the petitioner stated that he wanted to form a family unit with the biological mother and the child and to assume responsibilities as Daniel's father but the biological mother's actions prevented him from doing so. The petitioner had paid $100 to the physician who the biological mother had first visited in connection with her pregnancy. He also offered to pay the medical, hospital and nursing expenses incurred in connection with the biological mother's pregnancy and the child's birth but she refused all offers of assistance. He also made offers to both the biological mother and her husband to support the child after his birth.

After the biological mother broke off communication with the petitioner, he tried unsuccessfully on 7 or 8 occasions to talk to her. Thereafter, the petitioner kept abreast of the biological mother's condition and the course of her pregnancy through her sister and parents. In preparation for the child's birth, the petitioner bought baby clothes and other things for the infant. He learned of the child's birth from the biological mother's sister several hours after its occurrence. He at-

tempted to see the baby in the hospital but because the petitioner was not the father of record he was prevented from doing so. The biological mother's sister also informed the petitioner that the biological mother and her husband were consenting to a private placement adoption of the child. They executed the necessary irrevocable judicial consent within days of the child's birth.

The petitioner took prompt action to assert his right of custody. Just over a month after the child's birth, the petitioner sought an order of filiation and to obtain custody. The length of these proceedings have acted as a bar to the petitioner establishing any relationship with the child.

Of critical importance to the resolution of this matter is the Court of Appeals suggestion in *Matter of Raquel Marie X.* (76 NY2d 387, 408, *cert denied sub nom. Robert C. v Miguel T.,* — US —, 111 S Ct 517, *supra)* that the principles governing custody disputes between a natural parent and a third person are applicable to a determination of whether an unwed father's consent to the adoption of his out-of-wedlock child is required. In this regard, it is well established that a natural parent has a claim to the custody of his or her child "superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood" *(People ex rel. Kropp v Shepsky,* 305 NY 465, 468; *see, Matter of Male Infant L.,* 61 NY2d 420, 426). A natural parent may not be deprived of custody of a child absent a threshold showing of "surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances" *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 544; *see, Matter of Male Infant L., supra,* at 427; *cf., Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141, 144). Until the threshold of "extraordinary circumstances" has been satisfied, the question of the child's best interest is not reached *(see, Matter of Male Infant L., supra).* A natural parent may not be deprived of his child's custody merely because a court believes it can decide more wisely than the parent or believes it has found someone better to raise the child *(see, Matter of Male Infant L., supra,* at 426-427).

Application of these principles to the record before us reveals conclusively that a best interest analysis is premature. The record does not clearly demonstrate that the petitioner is unfit to assume the duties of parenthood. The petitioner was gainfully employed, had made arrangements for care of the child during the workday, and was serious about assuming his

responsibilities as a father. Indeed, the experts who conducted the court-ordered examination of the parties and testified on behalf of the adoptive parents did not find the petitioner to be unfit, but rather concluded that the child's best interest would be served by the adoptive parents retaining custody.

Nor did the petitioner abandon the child. Since he first learned that the biological mother and her husband were placing the infant for adoption the petitioner has engaged in a continuous and diligent effort to assert his right of custody and assume his parental duties. The fact that the child, who is now three years old, has no established relationship with the petitioner, should not be raised as a ground for denying him custody. This period of separation between the child and his natural father may not be attributed to any lack of interest on the petitioner's part. Rather it is due to the unfortunate pace of these court proceedings to establish his right to custody even though there is no dispute as to his paternity or as to his ability to assume his role as a parent.

In sum, although the adoptive parents may be able to provide the child with a more substantial home environment, it is not the province of the courts to usurp the natural parent's right of custody of a child in the absence of extraordinary circumstances. Under circumstances such as these, extraordinary circumstances have not been established so as to trigger a best interests inquiry *(see, Matter of Male Infant L., 61 NY2d 420, 428-429, supra; Matter of Nadia Kay R., 125 AD2d 674, 678).*

Turning to the principles espoused in *Matter of Raquel Marie X. (supra)* the evidence supports the conclusion that the petitioner made every effort to assume his parental responsibility. Indeed, his lack of success in exerting his parental rights may be directly attributable to the natural mother's effort to frustrate his efforts and prevent him from assuming his fatherly duties. The natural mother rebuffed the petitioner's offers of support and expression of concern. Contrary to the plurality's position, I do not believe that the State's interest in facilitating the adoption of out-of-wedlock children will be served by allowing a concerned and fit father to be deprived of custody of his child where the natural mother at every turn has thwarted his efforts to establish a relationship with the child. It would be unreasonable to fault the petitioner for not moving more quickly to establish his paternity and assume custody of the child when he took all the steps he could have reasonably taken under the circumstances. Until

he learned of the adoption, the petitioner could have harbored some hope of assuming a purposeful role in Daniel's life. He should not be faulted for being either overly optimistic or naive. His consent to the adoption was, therefore, required. Accordingly, I would reverse the order appealed from and grant the petition to stay the adoption proceedings.

KUNZEMAN, J., concurs with BROWN, J.; ROSENBLATT, J., concurs in the result in a separate opinion; THOMPSON, J. P., dissents in a separate opinion.

Ordered that the appeal from the order entered November 17, 1989, is dismissed, without costs or disbursements, as that order was superseded by the order entered January 10, 1990, made upon reargument; and it is further,

Ordered that the order entered January 10, 1990, is affirmed, without costs or disbursements.