Matter of Tatiana R. (2007 NY Slip Op 27351)

Matter of Tatiana R.

2007 NY Slip Op 27351 [17 Misc 3d 443]

August 29, 2007

Hamill, J.

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 14, 2007

[*1]
In the Matter of St. Vincent's Services, Inc., Petitioner, for the Custody and Guardianship of Tatiana R.
Family Court, Kings County, August 29, 2007

APPEARANCES OF COUNSEL

Mark Brandys, New York City, for father. McGovern & Sclafani, New York City (Megan Eiss-Proctor of counsel), for petitioner. Joan James, Brooklyn, for mother. Legal Aid Society, Brooklyn (Lori Masco of counsel), Law Guardian.

{**17 Misc 3d at 445} OPINION OF THE COURT

Bryanne A. Hamill, J.

Motions and Issues

Tatiana's father has filed two motions with respect to this termination of parental rights petition. The issues presented by his first motion are, first, whether the agency's petition to terminate the mother's parental rights should be held in abeyance, pending the conclusion of, and appeals from, the permanency{**17 Misc 3d at 446} hearing, and second, whether the agency is collaterally estopped from prosecuting its petition to terminate the mother's parental rights, which alleges that he is only entitled to notice thereof, as a result of a prior permanency hearing order. His second motion presents the primary issue of whether Domestic Relations Law § 111 (1) (d), which sets out the requirements for an unwed father to have veto rights over his child's adoption, is constitutionally infirm because it denies him equal protection and due process based on distinctions by gender and marital status.
Background

Tatiana was born on February 10, 2004 with a positive toxicology for opiates. This father, Mr. Q., is listed as her father on her birth certificate. Tatiana remained in the hospital for over a month due to withdrawal symptoms. When she was released from the hospital on March 17, 2004, the Administration for Children's Services (hereinafter ACS) conducted an emergency removal, and thereafter, she was remanded to ACS, subsequent to, and pending, the resolution of the neglect petition ACS filed against her mother and father on March 19, 2004. On April 16, 2004, Tatiana began to reside with her current nonkinship foster parents.
At the time Tatiana was born, both her mother and father were using street methadone and heroin. ACS's neglect petition alleges neglect by virtue of their substance abuse as well as the mother's mental illness. Tatiana's parents were not married at the time she was born or subsequently. An order of filiation was entered on May 11, 2004 upon the request and consent of her parents, because at that time the agency and parents did not have a copy of Tatiana's birth certificate in order to know whether Mr. Q. had established his paternity. Based on the parents' admissions and consent, a finding of neglect was entered against both parents on May 11, 2004. While this father was incarcerated, the court ordered him to be produced telephonically from prison in order that he could participate in all proceedings, including the permanency hearings. Upon consent, the court issued an order of disposition placing Tatiana with the Commissioner of ACS on September 7, 2004.
The last permanency hearing order was issued on October 18, 2005 wherein the court approved the goal of reunification with parents. However, the court extended the child's placement in foster care because the return of the child home would be contrary{**17 Misc 3d at 447} to her best interest, insofar as the respondent mother failed to make sufficient progress in her mental health and substance abuse services and the respondent father was incarcerated. The court approved a service plan for the father, which included successfully completing a drug treatment program and its aftercare component upon his release from prison. It is important to note that when Tatiana was placed in foster care, specifically nonkinship, her birth parents were warned and notified in this permanency hearing order as well as the prior disposition order that if Tatiana remained in foster care for 15 of the most recent 22 months that the agency may be required to file a petition to terminate parental rights.
The foster care agency filed a petition to terminate the mother's parental rights (hereinafter TPR) on the grounds of permanent neglect on June 16, 2006, and placed the father on notice of the pending petition, including his right to provide evidence regarding Tatiana's best interest at the dispositional phase.
[*2]
On September 29, 2006, this court commenced another permanency hearing, accepting documentary evidence and hearing testimony from the agency caseworker. ACS rested, and both parents requested an adjournment for purposes of testifying. Pending the conclusion of the permanency hearing, the court directed the agency to continue to work with the parents in planning for the return of their daughter. The court emphasized that even though the agency had recommended a goal of adoption and had filed a petition to terminate the mother's parental rights, this court required the agency to engage in concurrent planning, pending conclusion of the permanency hearing. The case had to be adjourned to January 19, 2007, the earliest date the court and all attorneys were available. On January 19, 2007, the law guardian was engaged in an emergency hearing, which takes priority over all matters before Family Court.[FN1]

The permanency hearing had to be adjourned to April 17, 2007, the earliest date the court and four attorneys were available.[FN2]{**17 Misc 3d at 448}

In February 2007, the father's counsel submitted two motions, the first requesting a stay of the termination of parental rights fact-finding, pending the permanency hearing and appeals. The second moved the court to dismiss the termination of parental rights petition, claiming Domestic Relations Law § 111 (1) (d) is unconstitutional as drawn and as applied.
On April 17, 2007, oral arguments were scheduled on these motions, but father's counsel was ill and Mr. Q. was hospitalized, necessitating an adjournment to May 31, 2007, the date set for the termination of parental rights hearing. On May 31, the court heard oral arguments on the father's two motions, and then proceeded to the termination of parental rights hearing, first conducting a hearing regarding the status of the father, pursuant to Domestic Relations Law § 111 (1), to determine whether he is only entitled to notice of the TPR or whether his consent is necessary to the adoption of Tatiana.
The agency called Mr. Q. to testify. He testified that he was working at a refrigeration company when Tatiana was born. He conceded that he did not pay Tatiana's hospital bills because he assumed that Medicaid would. He did not inquire if there were additional costs not covered by [*3]Medicaid, and claimed he never received any bills from the hospital. Mr. Q. knew the hospital in which Tatiana was born, and testified that he visited her there every night after work. He also testified that after her birth he was still using heroin and had not enrolled in a drug treatment program. Mr. Q. testified he bought Tatiana some clothes, rattles and bed sheets when she was born, but that he never provided any financial support for her either at the time she was born, before he was incarcerated in July of 2004, or after he was released from prison in February of 2006. Mr. Q. served a 20-month state prison sentence for criminal sale of drugs. Before his imprisonment in July of 2004, Mr. Q. testified that he consistently visited his daughter in foster care, but the agency, which this court credited, maintains he missed 7 out of 18 scheduled visits. The father also testified that during that same time period he had enrolled in an outpatient drug treatment program, but could not remember the name of the program. While the father was incarcerated, visitation with Tatiana was{**17 Misc 3d at 449} denied due to her young age and the far distance to his state prison. He did not maintain regular contact with the agency or the child during his imprisonment. Following his release in February of 2006, Mr. Q. testified he enrolled in a drug treatment program and for a time did not test positive for opiates. But in January of 2007, the father tested positive again for opiates.
Having carefully considered prior court orders, the conceded facts, and the credible testimony, this court denied both motions. This written decision incorporates the court's findings and conclusions.

Holding Termination of Parental Rights Petition in Abeyance

The first issue presented is whether the court must or should hold the termination of parental rights petition in abeyance, pending the conclusion of, and appeals from, the permanency hearing, and pending the court changing the goal to "free for adoption."
The father's counsel argues this is a case of first impression, and that despite the lack of statutory or case law support, this court should find that the Commissioner, or an authorized agency who has been vested with authority by the Commissioner, cannot file a petition to terminate parental rights until the permanency hearing and all appeals have been decided. The father's main argument is that the permanency hearing drives the petition to terminate parental rights and that a parent's due process rights are violated if the court does not first conclude the permanency hearing and approve a goal of "free for adoption." Further, the father maintains that only the Family Court has the authority to change the permanency goal.
The counsel for the agency, who did not submit any papers in opposition to the motion, argued that the intention of the New York Legislature in passing the new permanency laws of 2005, and Congress in passing the Adoption of Safe Families Act (hereinafter ASFA), was to ensure timely permanency for children who were languishing in foster care. The agency maintained that Tatiana, who has been in foster care for three years already, deserves permanency and would be prejudiced if the court held the TPR in abeyance. Further, the agency argued that under the executive branch, it has the discretion to change the permanency goal, since it is not "effectuated" until the court proceeds with the petition to terminate the parental rights. Lastly, the agency maintained it does not have to obtain the court's approval before it files a petition to terminate parental rights.{**17 Misc 3d at 450}
This issue raises questions that concern the essence of the permanency laws passed in December of 2005, and the roles that the judicial and executive branches play in these proceedings. [*4]In 2005, part of Family Court Act former § 1055 was replaced by article 10-A (Family Ct Act § 1086 et seq.), which governs permanency hearings for foster care placements. The main purpose of this new legislation was to improve permanency for children in foster care and bring New York in more affirmative compliance with federal guidelines set forth in ASFA and the requirements under title IV-E of the Social Security Act (42 USC § 670 et seq.). (NY Senate Sponsor's Mem, S228-5805, regular Sess, at ¶ 2 [2005].) The most significant change in the new law was Family Court's continuous jurisdiction from the day a child is placed in foster care until the date that permanency is achieved (e.g., family reunification, adoption, custody or guardianship). (See, Family Ct Act § 1088.) In addition, Family Court must now hold a permanency hearing every six months when a child continues in an out-of-home placement. (Family Ct Act § 1089 [a] [3].)
The United States Supreme Court has held that a court has "sound discretion" to hold a lawsuit in abeyance, especially if the parties and the issues are the same. (American Life Ins. Co. v Stewart, 300 US 203, 215 [1937].) The court's decision nevertheless turns on weighing various circumstances such as the "condition of the court calendar," whether certain parties had been "precipitate" or "dilatory" as well as other factors. (Id. at 216.) Hence a court must balance the benefits and hardships of holding a hearing in abeyance. (Id.)
Counsel's argument to hold the TPR in abeyance pending the permanency hearing and appeals is unpersuasive because it is contrary to the intent of the state and federal permanency laws and would prejudice Tatiana in obtaining permanency.
Pursuant to article 10-A, the Commissioner or the authorized agency has the obligation to recommend a permanency plan, which includes a permanency goal, such as but not limited to, "return to parent" or "free for adoption." (Family Ct Act § 1089 [c] [5].) Family Court is given authority to "approve . . . or modify" the goal in its order following the permanency hearing. (Family Ct Act § 1089 [d] [2] [i].) There is nothing in the statute or case law that limits an agency's discretion to change the permanency goal. The court does, however, have the authority to direct an agency not to change a permanency goal without the court's approval. (See, Family Ct Act § 1089 [d] [2] [viii].) Moreover, {**17 Misc 3d at 451}an agency is required to file a petition to terminate parental rights when a child has been in nonkinship foster care for at least one year or 15 of the most recent 22 months absent compelling circumstances. (Family Ct Act § 614 [1] [d]; Social Services Law § 384-b [7] [a].) The court also has the authority "where the court finds reasonable cause to believe that grounds for termination of parental rights exist" to direct the local social services district or other agency to institute a proceeding to legally free the child for adoption or permit the foster parents to file such a petition if the agency has not complied, unless there is good cause shown for delaying such a filing. (Family Ct Act § 1089 [d] [2] [viii] [E]; Matter of Dale P., 84 NY2d 72 [1994].) As such, based on the clear statutory language in article 10-A, the agency has the executive discretion to change the permanency goals and to file petitions to terminate parental rights, but Family Court has the ultimate authority to approve or modify the permanency goal and to either grant or deny the agency's petition for termination of parental rights. Ultimately, only the court can actually legally free a child for adoption.
The father argues that the purpose of a permanency hearing is to ensure parents' due process rights are respected and that is why the permanency hearing must drive the filing of a petition for terminating parental rights. One of the purposes of a permanency hearing is to conduct an audit, under a preponderance of the evidence standard, in order to ensure that the agency is meeting its [*5]obligations under the law and to review the parent's compliance with the approved service plan. (See, Matter of Belinda B., 114 AD2d 70 [4th Dept 1986] [holding that in a proceeding concerning the extension of foster care placement, the petitioner must establish by a preponderance of the evidence, the continued inability of the parents to take care of the child and that continued placement would serve the child's best interest].) The court's continuing jurisdiction is, inter alia, to ensure quicker permanency for the children who remain in foster care. The agency nevertheless maintains discretion to file for a petition for termination of parental rights if the statutory grounds exist, regardless of the status of the permanency hearing. (See, Belinda B., 114 AD2d at 76 [holding that Family Court should have issued a temporary order extending placement of the child in foster care until the permanent neglect proceeding was resolved]; see, Matter of Lindsay W., 129 AD2d 800, 802 [2d Dept 1987] [reasoning that a temporary extension of placement should have been issued by the Family Court since it would{**17 Misc 3d at 452} have facilitated the conclusion of the pending termination of parental rights proceeding and "facilitate a more intelligent and just determination"].) Nor does a particular permanency goal preclude an agency from filing a petition to terminate parental rights if the facts in the case have changed. (Matter of Justin Henry B., 21 AD3d 369, 370 [2d Dept 2005] [upholding the Family Court's determination to grant the petition for termination of parental rights even though the prior permanency hearing order stated that the goal was reunification because the facts in the case had changed since the time the original order was issued].) Finally, a permanency goal of "free for adoption" does not necessarily lead to a petition to terminate parental rights since the statute allows the court to adjudicate a particular goal yet direct the agency to engage in concurrent planning. (Family Ct Act § 1089 [c] [4] [iii]; [d] [2] [iv].)
With respect to the parents' due process rights, the father's argument is misplaced. The father relies on Santosky v Kramer (455 US 745 [1982]), which held that parents have a liberty interest in the custody of their children, which can only be legally severed by applying a higher burden of proof. As such, courts must use at least a clear and convincing standard in order to ensure parents' due process rights are respected. (455 US 745, 747 [1982]; accord Family Ct Act § 622.) Yet counsel relies on this decision to assert that the permanency hearing is meant to ensure parents' due process rights. The standard of proof at a permanency hearing is a preponderance of the evidence, lower then clear and convincing evidence. (Matter of Julian P.H., 177 Misc 2d 176, 179 [Fam Ct, Kings County 1998], affd sub nom. Matter of Commissioner of Admin. for Children's Servs. of City of N.Y., 254 AD2d 416 [2d Dept 1998] [stressing that the higher burden of proof in a petition to terminate parental rights is to ensure that parents receive due process protection when the State seeks to permanently deprive them of custody], citing Santosky, 455 US 745 [1982].) Notably, a court cannot sever a parent's parental rights at a permanency hearing, which is why the higher burden of proof is required at a termination of parental rights proceeding. (See, Santosky, 455 US at 759.)
In this case, Tatiana has been in foster care since birth. She is currently three years old and has been with the same foster parents, who would like to adopt her. The last permanency hearing order was dated October 18, 2005 in which the goal was approved as "return to parents." The subsequent permanency hearing began in September of 2006 and after three adjournments,{**17 Misc 3d at 453} due to attorney unavailability, has not been completed. The May 31, 2007 court date was originally set aside to start the TPR, which was filed in June of 2006. Based on the above analysis, the court finds that Tatiana, the subject child, would be prejudiced if the court granted the father's motion to hold the [*6]TPR in abeyance, since she has been in foster care for three years and deserves permanency. (See, Matter of Yan Ping Z., 190 Misc 2d 151, 158-160 [Fam Ct, Kings County 2001] [stressing the importance to proceed with the pending petition for termination of parental rights before the permanency hearing in order to ensure that the child, who has been in foster care for five years, receive permanency].) The father, on the other hand, is not prejudiced because the agency is still required to prove their cause of action by clear and convincing evidence and then, at disposition, that it serves the best interest of the child to be freed, all of which is appealable. This court declines the father's request to set a precedent, which would frustrate the purpose of the permanency law.

Collateral Estoppel

The next issue is whether the agency filing of the petition in June of 2006 to terminate the mother's parental rights and give the father notice is collaterally estopped by the permanency hearing order issued by this court in October of 2005, which stated that the goal was "return to parents."
It is established law that the doctrine of collateral estoppel bars the "relitigation of factual issues between the same parties when those issues were in controversy and actually determined in a prior lawsuit." (Julian P.H., 177 Misc 2d at 178, citing Kaufman v Eli Lilly & Co., 65 NY2d 449 [1985].) In order to establish collateral estoppel there must be (i) an "identity of issues" that were decided in the prior litigation and are decisive of the present litigation and (ii) the party against whom collateral estoppel is sought had a "full and fair" opportunity to be heard. (Id. at 178, citing Kaufman, 65 NY2d at 455.) Courts apply the doctrine of collateral estoppel with flexibility, considering competing policy concerns such as "fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results." (Matter of Jasmine R., 8 Misc 3d 904, 911 [Fam Ct, Queens County 2005], quoting Staatsburg Water Co. v Staatsburg Fire Dist., 72 NY2d 147, 153 [1988]; see, Matter of Deborah S., 115 Misc 2d 177, 183-184 [Fam Ct, NY County 1982].){**17 Misc 3d at 454}
In Family Court proceedings the timing of the various proceedings and orders may be dispositive as to whether the doctrine of collateral estoppel is satisfied. In Justin Henry B., the appellate court upheld a Family Court's determination to terminate the mother's parental rights based on permanent neglect, reasoning that the agency was not collaterally estopped from bringing the petition because the court's prior permanency hearing order, which held that the goal was reunification, was for a different time period. (21 AD3d at 370.) The Third Department similarly held in the Matter of Jesus II. that the agency was not barred by res judicata or collateral estoppel because the petitions to terminate the mother's parental rights were for different time periods. (249 AD2d 846, 847 [3d Dept 1998] [the agency refiled a petition to terminate the mother's parental rights after it was unsuccessful in satisfying their burden in the first petition].) Pursuant to Family Court Act § 1089 (a) (3), a permanency hearing must be held every six months. As such, if a petition to terminate the parents' parental rights is filed six months after the permanency hearing order was issued, the agency is not collaterally estopped since there no longer is an identity of issues and the party against whom collateral estoppel is sought did not have a full and fair opportunity to be heard.[FN3]

[*7]
Counsel relies on one Family Court case to argue that the agency is collaterally estopped in this case, but Julian P.H. is clearly distinguishable. In that case, following an extensive hearing pursuant to Family Court Act § 1055, the court concluded that the agency could not establish grounds for terminating the parent's rights and that the children would be trial discharged to the parents, that is released to the parent's physical custody. (Julian P.H., 177 Misc 2d at 178.) The Commissioner opposed the goal of reunification and filed a petition to terminate the parents' rights. The court held that the Commissioner was collaterally estopped, as a matter of law, because the material factual claims for the TPR were litigated at the{**17 Misc 3d at 455} permanency hearing, thus giving the Commissioner a "full and fair" opportunity to be heard. (Id.)
Notably, counsel has not submitted an affidavit to establish any facts relevant to his motion, including the relevant time frames and the specific permanency hearing order. However, counsel conceded during argument that the last permanency hearing order was issued on October 18, 2005, and that the TPR was filed more than six months thereafter, on June 16, 2006. Moreover, unlike Julian P.H. in which the agency filed a petition to terminate the parents' rights following an extensive hearing where the children were trial discharged to the parents' physical custody, here Tatiana has remained continuously in foster care since her birth. Therefore, for all the foregoing reasons, the doctrine of collateral estoppel does not apply. The father's first motion is denied in its entirety.

Second Motion

The father's second motion seeks dismissal of the petition alleging Mr. Q. as a notice father in the mother's TPR, pursuant to Domestic Relations Law § 111 (1) (d), claiming that the statute is unconstitutional and violates his rights to equal protection and due process, pursuant to the Fourteenth Amendment.
As a threshold issue the court must decide which paragraph of Domestic Relations Law § 111 (1) applies in this case. The father's counsel argues that Domestic Relations Law § 111 (1) (d) applies, whereas the agency argues that Domestic Relations Law § 111 (1) (e) applies. Since the statutory provisions and underlying policy concerns are different for an infant child placed for adoption as opposed to an older child placed for adoption, the court must first decide which section applies.
Domestic Relations Law § 111 (1) (d) is applicable when a child is born out of wedlock to a father and is "placed with the adoptive parents more than six months after birth." Domestic Relations Law § 111 (1) (e) applies when a child is born out of wedlock to a father and is "placed for adoption" under the "age of six months." The narrow issue becomes at what point in the context of an article 10 proceeding is a child "placed for adoption" or "placed with adoptive parents."
At a minimum a child is "placed for adoption" when a petition to terminate parental rights is sustained, because at that point, pursuant to Family Court Act § 1087 (b), the child is freed for adoption. Here the agency argues that Tatiana was "placed for adoption" when she was remanded to ACS as an{**17 Misc 3d at 456} [*8]infant and began living with her current foster parents. This interpretation misconstrues the applicable statutes. Domestic Relations Law § 111 (1) (d) and (e) only become applicable when the issue of adoption ripens into a justiciable issue. During an article 10 proceeding where a child is remanded into foster care, the parent's rights are still intact and the child's custody and care is only temporarily transferred to the Commissioner. (See, Family Ct Act §§ 1021-1024.) Foster care, at this point, is a temporary placement and is not the equivalent of a child being placed for adoption, which envisions a permanent home for a child. (See, Matter of Joyce T., 65 NY2d 39, 47-48 [1985]; Matter of Deborah S., 115 Misc 2d 177, 178-179 [Fam Ct, NY County 1982].)
Courts have consistently applied Domestic Relations Law § 111 (1) (e) in cases in which the mother surrenders her child for adoption at birth. (E.g., Matter of Raquel Marie X., 76 NY2d 387, 394 [1990], cert denied sub nom. Robert C. v Miguel T., 498 US 984 [1990] [child was surrendered two months after birth]; Matter of Baby Girl S., 76 NY2d 387, 394 [1990] [child was surrendered two days after birth]; Matter of Robert O. v Russell K., 80 NY2d 254, 260 [1992] [child was surrendered by the mother within days after birth]; Matter of John E. v Doe, 164 AD2d 375, 376 [2d Dept 1990] [child was surrendered by the mother several days after she gave birth].)
The analogous point in an article 10 proceeding is when the goal is changed to adoption and a cause of action has accrued, been filed, and, arguably, even sustained, to terminate the mother's parental rights. At the time of the filing of the TPR, the status of the father becomes most relevant legally, notwithstanding the agency's obligation to identify, locate, and notify fathers of children in foster care. (See, Family Ct Act § 1087 [b] [defining a "child freed for adoption" as a person whose custody and guardianship has been committed to an authorized agency pursuant to Social Services Law § 383-c, § 384 or § 384-b and that "(s)uch category shall not include a child who has been freed for adoption with respect to one parent but who has another parent whose consent to an adoption is required pursuant to (Domestic Relations Law § 111)"].) Based on the statutory requirements, TPRs generally will not be filed within six months of a child's birth.
Generally, courts apply Domestic Relations Law § 111 (1) (d) when a child was "placed" in foster care as an infant under six months but the adoption issue has not ripened until the child{**17 Misc 3d at 457} was over six months. (Matter of Ericka Stacey B., 27 AD3d 245, 246 [1st Dept 2006] [court applied Domestic Relations Law § 111 (1) (d) when child was "placed" with foster parents at birth and agency sought to terminate parental rights after two years]; Matter of Sergio LL., 269 AD2d 699, 699 [3d Dept 2000] [court applied Domestic Relations Law § 111 (1) (d) when child was "placed" into foster care at five months old and foster parents sought to adopt child when he was six years old]; accord, Matter of William R.C., 26 AD3d 229, 229 [1st Dept 2006].) Research revealed only one Family Court decision in which Domestic Relations Law § 111 (1) (d) was applied when a child was remanded into foster care under six months. (Matter of Baby Boy C., 2003 NY Slip Op 50865[U], at *4, affd on different grounds 13 AD3d 619 [2d Dept 2004].)
In the instant case, Tatiana was hospitalized at birth with withdrawal symptoms, and then legally removed from her mother and remanded to ACS when she was just a month old. She began residing with her current foster parents when she was only two months old. The petition to terminate the mother's parental rights, placing the father on notice, was filed in June of 2006, when Tatiana was two years old. Therefore, based on the foregoing analysis, the applicable statute concerning the father's consent status is Domestic Relations Law § 111 (1) (d).
The statutory requirements, pursuant to Domestic Relations Law § 111 (1) (d), for a child placed with the adoptive [*9]parents more than six months after birth are that the father had "maintained [a] substantial and continuous or repeated contact with the child as manifested by" (i) financial support of a fair and reasonable sum according to the father's means; and either (ii) father's visiting at least monthly if not prevented; or (iii) regular communication with the child or person or authorized agency having full care and custody of child, when visitation is not possible. The Court of Appeals has held that a father must demonstrate both support and communication, and stated that the financial support requirement is a threshold issue. (Matter of Andrew Peter H. T., 64 NY2d 1090, 1091-1092 [1985].)
Mr. Q. does not meet the requisite statutory requirements under Domestic Relations Law § 111 (1) (d) to be determined to be a father whose consent is required for the adoption of Tatiana. He conceded that he did not provide any financial support for Tatiana at any time despite the fact that he was employed both before and after his incarceration. Nor is Mr. Q. excused from providing financial support because the child was placed in{**17 Misc 3d at 458} foster care, since he still has an obligation to offer assistance or inquire from the agency of his financial responsibility. (See, e.g., Matter of Jamize G., 40 AD3d 543 [1st Dept 2007]; Baby Boy C., 13 AD3d at 621.) Further, while the father testified he bought Tatiana bed sheets, rattles and toys, these occasional gifts do not rise to the level of a fair and reasonable sum based on the father's means. (Matter of Maxamillian, 6 AD3d 349, 351 [1st Dept 2004].) With respect to the second requirement, visitation or communication, while Mr. Q. did maintain some visitation with Tatiana prior to, and after, his incarceration, this minimal visitation alone is not sufficient to establish his consent status. (Andrew Peter H. T., 64 NY2d at 1092; accord Matter of Robert R., 30 AD3d 309 [1st Dept 2006].) Furthermore, imprisonment does not excuse a parent from maintaining contact with the agency or child. (Baby Boy C., 13 AD3d at 620-621.) The father did not present any testimony or evidence that he maintained contact with Tatiana or the agency during his 20-month incarceration.
Even if the court were to analyze the status of Mr. Q. under Domestic Relations Law § 111 (1) (e) and the factors set out by Raquel Marie X., as a child placed for adoption under six months, he would not rise to the level of a consent father. In Raquel Marie X., the Court of Appeals held that Domestic Relations Law § 111 (1) (e) violates the Fourteenth Amendment Equal Protection Clause because it required unmarried fathers to live together with the mother for at least six months preceding the child's placement for adoption, while not imposing such a requirement on other classes of parents. (76 NY2d at 394.) The Court reasoned that this requirement only "tangentially" relates to the parental relationship and therefore does not further the State's interest to make infant adoptions "surer and speedier." (Id. at 404-405.) The Court specifically addressed the constitutional and policy issues raised by an adoption of an infant as opposed to an older child and noted that while a father has less of a chance to have custody of an infant, the onus is still on the father to promptly manifest parental responsibility. (Id. at 408.) Although the Court only held that the living requirement of Domestic Relations Law § 111 (1) (e) was unconstitutional, it nevertheless set out a new standard based on the statutory requirements of Domestic Relations Law § 111 (1) (e) as to what an unwed father must establish, pending a statutory amendment. (Matter of John E. v Doe, 164 AD2d 375, 379 [2d Dept 1990].) The factors a court must consider in order to establish{**17 Misc 3d at 459} consent status is the father's "public acknowledgement of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child." (Baby Boy C., 13 AD3d at 620, quoting Raquel Marie X., 76 NY2d at 408.) The court must assess these factors based on the father's actions in the "six [*10]continuing months immediately preceding the child's placement for adoption." (Raquel Marie X., 76 NY2d at 408.)
Here, if the court were to find that placement for adoption occurred at the time Tatiana was removed and remanded to ACS and then to reside with the foster parents at two months old, the applicable time period would be the six months preceding this placement: October 16, 2003 through April 16, 2004. Despite the fact that Mr. Q. publicly acknowledged his paternity, he did little more to establish a relationship with Tatiana or prepare to take actual or legal custody of her. Mr. Q. never offered to pay for the pregnancy and birth expenses, instead assumed Medicaid covered them. (Compare, Matter of Kiran Chandini S., 166 AD2d 599, 601 [2d Dept 1990] [the Court affirmed the lower court's finding that the father's consent was required for the adoption and emphasized that even though the father did not pay for the mother's hospital bills he had offered to do so but the mother declined his assistance because she had Medicaid].) Further, Mr. Q. testified that he had a job at the time Tatiana was born, yet he did not assist the birth mother in maintaining adequate housing while she was pregnant. Nor did Mr. Q. buy any provisions to help prepare for baby Tatiana's return from the hospital. Notably, Mr. Q. admitted to using heroin at the time Tatiana was born but did not enroll in a drug program. Further, before and after ACS removed Tatiana who was suffering withdrawal symptoms, Mr. Q. did not file a petition for custody. These actions "fall . . . short of the promptness expected of an unwed father to assert an interest in his child, and fail[ ] to demonstrate a willingness and ability to be a custodial parent." (Baby Boy C., 13 AD3d at 621.)
Based on the foregoing analysis, under both paragraphs of Domestic Relations Law § 111 (1), Mr. Q. does not rise to the level of a consent father, and thus, is only entitled to notice and to present evidence regarding Tatiana's best interest, if the dispositional phase is reached. (Domestic Relations Law § 111-a.)
The father's counsel also argues that it is unfair to treat Mr. Q. as a father under the article 10 proceeding, requiring him to{**17 Misc 3d at 460} participate in various services, but then to plead him only as a notice father for the termination of parental rights proceeding. There are reasons why the statutory framework has this distinction. First, the standard for holding a father liable pursuant to an article 10 petition can be based solely on a biological connection or the person's status as a caretaker.[FN4]

However, a father's right to essentially veto an adoption is not based merely on biology or a legal relationship with the child, but the quality of the parental relationship. (Raquel Marie X., 76 NY2d at 401 [stressing that a father must "both be a father and behave like one"].) Furthermore, the issue concerning the status of a father's consent to an adoption is not ripe until a TPR or surrender is filed.
Nor is Mr. Q. prejudiced by the agency's decision to plead him only as a notice father as opposed to filing a petition to terminate his parental rights pursuant to Social Services Law § 384-b. The father's counsel did not present any legal arguments to suggest why the agency may be avoiding its statutory obligations by pleading him as a notice father, nor were any facts put forward to demonstrate that the father is prejudiced by this action. In fact, courts have consistently held that if an agency can establish that a father's consent is not required, pursuant to Domestic Relations Law § 111 (1), the agency does not have to prove a [*11]ground for terminating the father's parental rights. (Matter of Kasiem H., 230 AD2d 796, 797 [2d Dept 1996] [holding that pursuant to Social Services Law § 384-b (4) (b) the agency did not have to prove abandonment because the record established that the father was not entitled to consent status under Domestic Relations Law § 111 (1) (d)]; accord Baby Boy C., 13 AD3d at 619; accord Matter of Catholic Child Care Socy. of Diocese of Brooklyn, 112 AD2d 1039, 1040-1041 [2d Dept 1985]; Matter of Ericka Stacey B., 27 AD3d 245, 246 [1st Dept 2006] [holding that if a father is deemed to be a notice father under Domestic Relations Law § 111 (1) (d) the issue of whether he permanently neglected the subject child is rendered academic]; Matter of Dominique P., 24 AD3d 335, 336 [1st Dept 2005] [holding that the agency could just plead the father as a notice father under Domestic Relations Law § 111 (1) as long as the Family Court held an evidentiary hearing to determine his status]; Matter of Doral B., 2 AD3d 1338, 1338 [4th Dept 2003]{**17 Misc 3d at 461} [modifying the Family Court's order to delete the references to permanent neglect since the agency established that the father was only entitled to notice and therefore was not obligated to prove both causes of action]; accord Matter of John D., 2001 NY Slip Op 40168[U] [Fam Ct, Queens County 2001].)

The Constitutionality of Domestic Relations Law § 111 (1) (d)

The father makes several arguments concerning Domestic Relations Law § 111 (1) (d). First, he argues that Domestic Relations Law § 111 (1) (d) is unconstitutional because it violates the Equal Protection Clause of the Fourteenth Amendment since it sets out requirements for unwed fathers to establish a right to veto an adoption while not requiring such a showing for married fathers or any mothers. As such, the respondent father maintains that the statute is unconstitutionally drawn based on its classification of sex and marital status. Further, he argues that the statute is unconstitutional as applied to him because he was treated by the agency as a biological father, and has complied with services provided by the agency. Second, he argues that he has a fundamental liberty interest as a natural parent that is protected by the Fourteenth Amendment Due Process Clause.
Initially, the court must first address whether the father's due process right is violated by denying him a right to veto the adoption of his child. It is essential to establish the contours of his liberty interest, since it will also dictate the protection that he is entitled to under the Equal Protection Clause. (Raquel Marie X., 76 NY2d at 398, citing Quilloin v Walcott, 434 US 246, 256 [1978].)
The father argues that a "natural father's right to assert paternal rights has been held to be a fundamental right." (Father's motion at 5.) This is a misinterpretation of the established jurisprudence regarding an unwed father's constitutional rights. The Fourteenth Amendment provides that no state shall deprive any person of life, liberty, or due process of law. While a natural parent has a liberty interest in the care and custody of his or her child, that liberty interest may be limited if the unwed father does not establish a significant and substantial relationship with his child.
In the past three decades, the United States Supreme Court has decided, in a series of cases, issues concerning the parameters of an unwed father's constitutional right as a parent. In Stanley v Illinois the Court invalidated an Illinois statute and{**17 Misc 3d at 462} held for the first time that an unwed father, who has sired and raised his children, has a protected interest absent a powerful countervailing interest. (405 US 645 [1972].) As such, Stanley was entitled, under the Due Process Clause, to a hearing before his children were removed from his care. (Stanley, 405 US at 651.) Furthermore, the Court also held that the Illinois statute violated the Equal Protection Clause since it denied unwed fathers who were similarly situated as other custodial parents equal protection of the law. (Id. at 658.)
In Quilloin, the Court again reaffirmed that the relationship between a "parent and child is [*12]constitutionally protected" (434 US at 255), but held that the degree of protection a state must afford an unwed father depends on the substantiality of the countervailing interests. (Id. at 248.) Relying on the fact that the father never had nor ever sought legal custody of his son and that the child was being adopted by a "family unit already in existence," the Court found no violation of the father's due process rights. (Id. at 255.) Further, the Court also held that the father was not denied equal protection of the law because unmarried fathers are not similarly situated as married fathers since married fathers have legal custody of their children and bear "full responsibility for the rearing of [their] children during the period of the marriage." (Id. at 256.)
One year later, the Supreme Court again considered the rights of an unwed father in Caban v Mohammed (441 US 380 [1979]). Unlike the father in Quilloin, the father in Caban had had legal and physical custody of his children at one time and had supported them. (441 US at 382.) The Court held that New York's statute (Domestic Relations Law § 111), denying all unwed fathers the right to veto an adoption even when the father has had a substantial relationship with his children, violated the Equal Protection Clause because it made a distinction between the rights of unmarried fathers and the rights of unmarried mothers which did not substantially relate to an important government interest. (Id. at 382.) The Court reasoned that while New York's goal of promoting timely adoption of children born out of wedlock in order to give them a stable two-parent home is important, the means chosen by the Legislature did not reasonably further those ends. (Id. at 391.) Thus, the Court held that Domestic Relations Law § 111 was an example of an " 'overbroad generalization' " in gender-based classification. (Id. at 394.) The Court did not address appellant's additional argument concerning the statute's differential treatment of married and unmarried fathers. (Id. at 394 n 16.){**17 Misc 3d at 463}
In Lehr v Robertson the Supreme Court again addressed the rights of unwed fathers, specifically focusing on their procedural due process rights. (463 US 248, 251 [1983].)[FN5] The Court sustained New York's statute providing notice to fathers in adoptions (Domestic Relations Law § 111-a), holding that the father's procedural due process rights were not violated because all the father had to do to receive notice of the adoption was register with the putative father registry. (Id. at 265.) Critically, the Court again outlined the contours of an unwed father's liberty interest stating "that the rights of the parents are a counterpart of the responsibilities they have assumed" (id. at 257), and that "[p]arental rights do not spring full-blown from the biological connection between parent and child" but "require relationships more enduring." (Id. at 260.) Particularly, the Court addressed the father's argument that New York's notice statute denies the father an opportunity to form such a relationship and held that:
[*13]
"The significance of the biological connections is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship . . . If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie." (Id. at 262.)
The Court also held that New York's statutes did not operate to deny the father equal protection of the laws based on gender-based classification. (Id. at 267.) The Court reasoned that unlike the father in Caban, who had formed a substantial and significant relationship with his children, the father in this case had not formed such a parental relationship with his daughter and therefore was not entitled to the same rights as the mother. (Id. at 267.) The Court stated that if "one parent has an established custodial relationship with the child and the other parent has either abandoned or never established such a relationship,{**17 Misc 3d at 464} the Equal Protection Clause does not prevent a state from according the two parents different legal rights." (Id. at 267-268.)
Here, the father's actions and relationship with his daughter do not rise to the level to warrant constitutional protection, pursuant to the Due Process Clause. Unlike the father in Caban, who had legal and actual custody of his children at one time and had supported them, Mr. Q. never had actual or legal custody of Tatiana. He did not even take steps to prepare to obtain custody of her, as he continued to use heroin after her birth, and did not buy any provisions or make any arrangements to provide her a home. Further, despite having a job at the time of Tatiana's birth, he did not provide financial support to the mother during her pregnancy or following the birth of Tatiana. During his incarceration, he had no contact with the agency or his daughter.
The issue becomes whether Domestic Relations Law § 111 (1) (d) violates the Equal Protection Clause on its face or as applied, based upon its requirement for unwed fathers to establish a substantial and significant relationship with the child in order to be deemed a consent father, while not requiring such a showing for married fathers or mothers.
Statutes that draw gender-based distinctions "must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to withstand judicial scrutiny under the Equal Protection Clause. (Caban, 441 US at 388.) In Caban, the Court held that while the government interest of promoting adoptive homes for children born out of wedlock is important, the state may not achieve that interest by denying a natural father's right to veto the child's adoption simply based on the father's gender. (Id. at 391.) The Court nevertheless emphasized that "[i]n those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the state from withholding from him the privilege of vetoing the adoption of that child." (Id. at 392.)
With respect to Domestic Relations Law § 111 (1) (d), the statute denies an unwed father a right to veto an adoption only if that father has not had a substantial and continuous relationship with the child. This is consistent with the Supreme Court's holding in Caban. If an unwed father has a substantial and continuous relationship with his child, as the father did in Caban, then he can enjoy the privilege to veto the adoption.{**17 Misc 3d at 465} Therefore, the requirement set out by Domestic Relations Law § 111 (1) (d) to demonstrate a father's relationship with the child substantially relates to the government's interest of ensuring the welfare [*14]of a child born out of wedlock.
In the instant case, Mr. Q. did not establish that he has a substantial and continuous relationship with his daughter, Tatiana. Accordingly, he does not have a protected liberty interest and is not similarly situated as other parents who are married. Therefore, the distinction drawn by Domestic Relations Law § 111 (1) (d) does not violate his equal protection rights.
The father further argues that, based on the Family Court's decision in Matter of M./B. Children (7 Misc 3d 272 [Fam Ct, Kings County 2004]), Domestic Relations Law § 111 (1) (d) was unconstitutional as applied to him.[FN6]

In that case, the Family Court held that Domestic Relations Law § 111 (1) (d) is unconstitutional as applied to the father, Mr. B., and that the petition pleading him as a notice father be dismissed because it denied Mr. B. the equal protection of the laws based on sex and marital status. (7 Misc 3d 272, 283.) Relying on the Court of Appeals reasoning in Raquel Marie X., the court reasoned that the marriage requirement is "tangential" and "incidental" to the father-child relationship and that marriage is "fundamentally a relationship between father and mother, or, indeed, between husband and wife if they are childless." (Matter of M./B., 7 Misc 3d at 281, quoting Raquel Marie X., 76 NY2d at 405-406.) The court further noted that since the statute requires consent of a married father without further qualifications, the statute is based on an implicit assumption that a father who is married to the mother will have a significant or substantial relationship with the child. (Matter of M./B., 7 Misc 3d at 281.) In Matter of M./B. (7 Misc 3d at 282), the Family Court held that the statute was unconstitutional as applied to Mr. B., reasoning that even though the father did not satisfy the criteria in Domestic Relations Law § 111 (1) (d), he nevertheless established a substantial relationship with his children that "merit[s] constitutional protection of his rights, comparable to the protection granted to unmarried mothers and married/divorced fathers." (Id. at 279.) The court relied on the fact that the father had lived with the{**17 Misc 3d at 466} children and mother for several years at one time and that at one point the father even had sole custody of the children for one year. Furthermore, when the children's custody was transferred to the grandmother, the father had orders of visitation. Lastly, even while the father was incarcerated he maintained some contact with the children. (Id. at 274-275.) Accordingly, the Family Court held that because the father had established a substantial and significant relationship with four of his children, Domestic Relations Law § 111 (1) (d) was unconstitutional as applied to him for those four children. However, the court held that the statute was constitutional as applied to the father with the youngest child because the father had not established a parental relationship with that child. (Id. at 283.)
The instant case is distinguishable from Matter of M./B. in that, unlike that father with four of his children, Mr. Q. never lived with Tatiana, never had legal or physical custody of her, and only minimally visited her before and after his incarceration. He never even took steps to obtain custody [*15]or financially to support her when he was working. As such, Mr. Q.'s relationship with Tatiana is more akin to Mr. B.'s relationship with his youngest child in which the Family Court found that the application of Domestic Relations Law § 111 (1) (d) is constitutional.
Lastly, with respect to the father's argument about the statute's classification based on marriage, he offered no case law to show that this classification is unconstitutional. In fact, the Supreme Court's reasoning in Quilloin clearly suggests that it is permissible for a state to make a classification based on marriage because a married father, unlike an unmarried father, has certain obligations including child support and legal or actual custody over the child, and thus "shoulder[s] . . . significant responsibility with respect to the daily supervision, education, protection, or care of the child." (434 US at 256.) Further, in Raquel Marie X., the Court of Appeals signified in dicta that a classification based on marriage status is permissible. Specifically, the Court stated when considering the subsequent marriage of the father in Raquel that "marriage obviously may be considered as one factor in determining whether the father has manifested the requisite parental responsibility, but the marriage must be timely in order to be considered substantial." (76 NY2d at 409.){**17 Misc 3d at 467}

Conclusion

Based upon the foregoing analysis, Mr. Q. does not meet the requirements of a consent father, under Domestic Relations Law § 111 (1) (d), because he did not have a substantial and continuous relationship with his daughter Tatiana for the past three years. Moreover the distinction drawn by the statute is constitutionally permissible because it is based on the relationship an unwed father establishes with his child. Accordingly, both motions are denied in their entirety.

Footnotes

Footnote 1: Family Court Act § 1028.

Footnote 2: According to a position paper prepared by New York City Bar Association's Council on Children, recommending, inter alia, additional judicial resources, since 2006 the average case load a child protective judge carries in Kings County Family Court is 725 children. This data does not include permanency hearings after disposition; if permanency hearings were included, it is estimated that in Kings County the average combined case load for a judge and his or her assigned referee is 1,300 children. In addition to an overburdened court calendar, the various attorneys for the parties also have limited availability due to their high case loads; law guardians, for instance, have between 200 and 300 clients, while prior to 2006 their average case load was between 150 and 200 clients. (The Permanency Legislation of 2005: An Unfunded Mandate—Critical Resource Needs for New York City's Children and Families, NY City Bar Assn's Council on Children, Aug. 2007.)

Footnote 3: Even though an identity of parties is not necessarily required since parties may have privity between each other, there nevertheless may be a concern about the applicability of the doctrine of collateral estoppel from permanency hearings, which are prosecuted by ACS, while petitions to terminate parental rights are prosecuted by ACS's contracted foster care agency. Although it is arguable that there is privity between the agency and ACS and the agency is a party to permanency hearings although they may not appear by counsel, it is still a fact-specific analysis. (See, Matter of Tiffany H., 171 Misc 2d 786, 793 n 9 [Fam Ct, Kings County 1996].)

Footnote 4: Family Court Act § 1012 (a) defines a respondent in an article 10 petition as any parent or other person legally responsible for a child's care who is alleged to have abused or neglected such child.

Footnote 5: In this case the child, Jessica, was born out of wedlock and the mother got married several months after Jessica's birth to another man. When Jessica was almost two years old the stepfather wanted to adopt her. An order of adoption was entered but the biological father contends that it is invalid because he was not given any advance notice about the adoption proceeding. Further, the father had lived with the mother prior to Jessica's birth and visited her at the hospital but did not sign the birth certificate. The father never lived with Jessica and did not provide any financial support. (463 US at 251-252.)

Footnote 6: The constitutionality of Domestic Relations Law § 111 (1) (d) has not been considered yet by an appellate court. In Matter of Andrew Peter H. T., the Court of Appeals declined to address the father's constitutional argument and instead remanded the case to decide whether the father had satisfied the threshold requirement of support. (64 NY2d at 1092.)