■ In the Matter of RAYMOND AA., Appellant, v JANE DOE et al., Respondents. (And Another Related Proceeding.) [629 NYS2d 321] —Peters, J. Appeals from two orders of the Family Court of Ulster County (Work, J.), entered January 28, 1994 and March 15, 1994, which, *inter alia*, dismissed petitioner's application, in a proceeding pursuant to Family Court Act article 6, for custody of his son.

Petitioner is the biological father of Baby Boy BB., born in 1993, and respondent Leah BB. (hereinafter respondent) is the child's biological mother. They met in July 1992 and began living together shortly thereafter. Within approximately three months, respondent became pregnant. It is uncontroverted that petitioner was happy about the pregnancy and openly acknowledged his paternity. At such time, he was receiving $68.50 in public assistance every two weeks, his share of rent was paid for by public assistance and he received food stamps. While he had been employed for a short period of time in 1992, he ceased working thereafter due to a disabling back injury sustained when he walked off a 30-foot cliff while intoxicated.* Petitioner remained unemployed from July 1992 through April 1993 when respondent ultimately left him.

During the trial, petitioner openly acknowledged that he drank heavily during the time that he and respondent lived together, smoked marihuana, used crack cocaine and LSD.

* Social Security disability benefits were denied to petitioner based upon a determination that he was eligible to work and able to lift 20 pounds and carry 10 pounds.

Petitioner acknowledged that he became a different person when he was drinking, often becoming possessive and violent, resulting in the periodic destruction of the apartment he shared with respondent and the things in it. He further admitted that respondent had not condoned his use of alcohol or drugs or his lack of employment and that he refused to stop drinking until after the baby was born. Respondent was further dissatisfied with the living conditions in the apartment since there were several other people who regularly lived or slept there and she was the only person with a job.

When respondent became pregnant, she was placed on Medicaid for her medical expenses and began receiving public assistance. Petitioner received an increased public assistance grant as the result of respondent's grant having been placed in his name, yet most of this money went directly to the landlord for the payment of rent. After February or March 1993, he received only $30 every two weeks for spending money. He testified, however, to having spent approximately $24 to $36 each week on beer, $10 every one to two weeks on marihuana and an undisclosed amount of money on LSD. Clearly exceeding the income he received, petitioner admitted that he borrowed the money from respondent or his mother to pay for his drug and alcohol consumption. Petitioner further testified that he spent only $10 on a stroller during respondent's pregnancy, did not purchase anything else for either respondent or the baby, did not attempt to save any money, and did not discuss with respondent any future plans for the baby other than where it would sleep. Petitioner and respondent testified that they received gifts from family and friends for the baby's needs, although most of these gifts were unsuitable for use.

On or about April 19, 1993, respondent moved out of petitioner's apartment and eventually explained to him that she could no longer cope with his violent behavior, his excessive drinking, their living conditions or the control that she felt he exerted over her life. Petitioner testified that he did not disagree with respondent's characterization of him. He testified that after respondent left him, he began attending Alcoholics Anonymous (hereinafter AA) meetings and unsuccessfully tried to persuade respondent to return to him. Respondent further testified that she did not contact petitioner after she left, did not tell him about her subsequent decision to arrange for a private adoption, and did not inform him of the baby's birth. Pursuant to an extrajudicial consent, on June 14, 1993 the infant was placed in the custody of the adoptive parents, respondents Jane Doe and John Doe.

Sometime between May and September 1993, petitioner began living with his current girlfriend who, at the time of the hearing before Family Court, was pregnant with his child. On June 21, 1993, after learning of the proposed adoption, petitioner filed a paternity petition. An order of filiation was entered on July 9, 1993 and petitioner sought custody shortly thereafter. A hearing was held in Family Court, beginning on August 19, 1993, during which time petitioner was permitted visitation with the child. During such time, petitioner obtained a job at Burger King, which steadily increased his hours of work, attended AA irregularly, applied for parenting classes and, on October 6, 1993, two days prior to the conclusion of the hearing, entered Turning Point, a 28-day in-patient rehabilitation program.

Family Court dismissed petitioner's application for custody and granted the adoptive parents' application to dispense with petitioner's consent to the adoption. It further terminated petitioner's visitation and determined that it was in the best interest of the child to allow the adoption to proceed. Orders were entered and these appeals ensued.

Petitioner primarily contends that the determination to dispense with his consent as a result of his conduct in the six months preceding the placement was based upon an erroneous interpretation of the Court of Appeals holding in *Matter of Raquel Marie X.* (76 NY2d 387, *cert denied sub nom. Robert C. v Miguel T.*, 498 US 984) and violates his right to equal protection, since the result is an impermissible gender-based distinction which is not substantially related to any legitimate State interest. Petitioner further contends that he has a fundamental right to raise his child and therefore the current orders under review violate his due process rights. Finally, petitioner contends that Family Court's determination is against the weight of the evidence.

It is axiomatic that the State has a legitimate interest in establishing procedures which assure both a prompt adoption and the stability of an adopted child (*see, e.g., Matter of Robert O. v Russell K.*, 80 NY2d 254, 264; *Matter of Raquel Marie X.*, *supra*, at 403-404). Noting that this interest must be balanced against the right of biological parents to raise their children and that unwed fathers "enjoy parental rights protected by the Federal Constitution" (*Matter of Robert O. v Russell K.*, *supra*, at 261-262; *see, Lehr v Robertson*, 463 US 248; *Caban v Mohammed*, 441 US 380; *Quilloin v Walcott*, 434 US 246; *Stanley v Illinois*, 405 US 645), the Court of Appeals declared unconstitutional Domestic Relations Law § 111 (1) (e), which required the

consent of an unwed father to the adoption of a child born out of wedlock only where he had lived either with the child or the mother for the six months preceding the adoption (*see, Matter of Raquel Marie X., supra,* at 404-407).

Yet, in *Matter of Raquel Marie X. (supra),* the Court of Appeals clearly opined that the fundamental right of an unwed father to a continued parental relationship is not unlimited and may be established by the father's "manifestation of parental responsibility" (*supra,* at 408). As such, it must be conditioned on both a prompt assertion of an interest in assuming custody (not merely as a device to block an adoption by others), coupled with a judicial evaluation of a manifestation of parental responsibility within the six months preceding the child's placement for adoption (*see, supra*). Such judicial evaluation will include an assessment of any unfitness, abandonment or waiver on the part of the father pursuant to the standards articulated in *Matter of Bennett v Jeffreys* (40 NY2d 543), as well as "such considerations as his public acknowledgment of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child" (*Matter of Raquel Marie X., supra,* at 408). Accordingly, "[t]here must be manifestation through action on the part of the unwed father. Absent that, the biological link of the father is insufficient to create a constitutionally protected interest" (*Matter of Robert O. v Russell K.,* 80 NY2d 254, 265, *supra* [citation omitted]; *see, Lehr v Robertson, supra,* at 261).

While petitioner acted promptly to assert his interest in obtaining custody of the child after learning of the planned adoption, the testimony supports Family Court's determination that, in the six months preceding the child's placement, petitioner did little to establish his interest in assuming the responsibilities of parenthood. While correctly contending that the mere fact that petitioner received public assistance was not determinative of his ability to be a parent (*see, Matter of Corey L. v Martin L.,* 45 NY2d 383), and that respondent's receipt of Medicaid obviated petitioner's need to pay for her medical expenses (*see, Matter of Kiran Chandini S.,* 166 AD2d 599, 601), the testimony nonetheless establishes that petitioner was consistently unemployed during the time that respondent was pregnant, attributing such to a back injury which apparently did not prevent him, among other things, from routinely carrying large quantities of beer home from the store.

In addition to petitioner's refusal to attend respondent's first Lamaze class because he was both intoxicated and high on

LSD (although he drove respondent to class in such condition and had done so without a license to drive an automobile), for the two Lamaze classes petitioner did attend he "reeked of alcohol". The record further reflects that petitioner spent more money on drugs and alcohol than he received in public assistance, using respondent's money for this purpose. Finally, through petitioner's admissions, it is clear that he purchased nothing for respondent or the baby with the exception of a $10 stroller, relying instead on donations from family and friends. Hence, from the record before us, we find that Family Court correctly concluded, based upon the factors set forth in *Matter of Raquel Marie X.* (76 NY2d 387, *supra*), that petitioner was manifestly unable to assume custody of the child should custody have been awarded to him.

Based on the foregoing, we find that Family Court's conclusion that petitioner chose not to engage in any conduct indicative of a manifestation of parental responsibility in the six months preceding the child's placement for adoption is fully supported by the record. Accordingly, the decision to dispense with his consent to the adoption did not deprive petitioner of his rights to either due process or equal protection (*see, Matter of Baby Girl*, 206 AD2d 932; *Matter of Female Infant F.*, 191 AD2d 437).

In so holding, we note that petitioner has mistakenly relied upon the holding of *Caban v Mohammed* (441 US 380, *supra*) to support his contention that he has been denied his right to equal protection based upon his status as an unwed father. Where, as here, the unwed father has done little or nothing to establish a substantial parental tie to the unborn or newborn child in accordance with the criteria set forth in *Matter of Raquel Marie X.* (*supra*), the State commits no violation of his right to equal protection in dispensing with his consent to the adoption (*see, Matter of Robert O. v Russell K.*, 80 NY2d 254, 267, *supra*; *compare, Matter of Commissioner of Social Servs. (Lisa U.) v Steven V.*, 207 AD2d 162, 165, *lv granted* 85 NY2d 808). We further find that petitioner's purported "qualifying interest" was nothing more than an effort to block the adoption by others, rather than assuming custodial care himself, by virtue of his own testimony that he was content to have visitation if respondent had decided to keep the baby.

Having determined that there was no need for petitioner's consent to the adoption since he failed to establish that his interest was "deserving of constitutional protection" (*Matter of John E. v Doe*, 164 AD2d 375, 376, *lv denied* 78 NY2d 853), we find that Family Court correctly determined that it was in the best interest of the child to remain with the adoptive parents

and permit the adoption to proceed (*see, Matter of Raquel Marie X., supra,* at 408; *Matter of John E. v Doe, supra,* at 379; *see also, Matter of Bennett v Jeffreys,* 40 NY2d 543, *supra*).

As to petitioner's contention that Family Court committed reversible error in refusing to order an alcohol evaluation of petitioner, we find no merit. We note that the record reflects that at the initial stages of this proceeding all parties requested an alcohol evaluation and that petitioner's attorney refused to consent thereto. While such parties subsequently agreed that an evaluation should be performed, no order was submitted for Family Court's authorization and the issue was not raised again until the hearing neared its conclusion. Hence, since petitioner's attorney expressly refused to consent to the evaluation at a time when the disposition of the case would have not been delayed as a result thereof, petitioner may not now allege error by Family Court for its refusal to grant a continuance (*see, Matter of Gambino v Vargas,* 209 AD2d 893). Moreover, we find no merit to petitioner's contention of error in Family Court's refusal to consider the records from Turning Point, since the information therein was irrelevant to the period during which petitioner's fitness was to be assessed.

As to all other issues raised herein, we have reviewed them and found them to be without merit.

Cardona, P. J., Mikoll, Mercure and Casey, JJ., concur. Ordered that the orders are affirmed, without costs.