2010 Ark. App. 556

**X.T., Appellant**

v.

**M.M. and J.M., Appellees.**

**No. CA 09–1225.**

Court of Appeals of Arkansas.

Sept. 1, 2010.

Hart, J., filed dissenting opinion in which Vaught, C.J., and Gladwin, J., joined.

Baker, J., filed dissenting opinion in which Vaught, C.J., Hart and Gladwin, JJ., joined.

W. Marshall Prettyman, Legal Aid of Arkansas, Fayetteville, for appellant.

Glenn E. Kelley, Kelley Law Firm, Rogers, for appellee.

JOHN MAUZY PITTMAN, Judge.

This is an appeal from an order of the Benton County Circuit Court finding that consent to adoption was not required of appellant X.T. because, although he was a putative father of baby girl A.M., he failed to establish a significant custodial, personal, or financial relationship with her before the petition for adoption was filed. Ark. Code Ann. § 9–9–207(a)(11) (Repl.2009). The trial court further found that, even if appellant's consent to the adoption had been required, he was unreasonably withholding that consent contrary to the best interest of the child. Ark.Code Ann. § 9–9–220(c)(3) (Repl.2009). On the basis of these findings, the trial court granted the adoption petition and terminated appellant's parental rights. From that order, appellant brought this appeal, arguing that the trial court erred in finding that his consent to the adoption was not required and in finding that his consent was in any event unreasonably withheld. We find no error, and we affirm.

We review probate proceedings de novo on the record, but a finding of fact by the circuit court will not be disturbed unless it is clearly erroneous, giving due regard to the opportunity and superior position of the trial judge to determine the credibility of the witnesses. *Fletcher v. Scorza*, 2010 Ark. 64, 359 S.W.3d 413. A finding is clearly erroneous when, despite evidence to support it, we are left on the entire evidence with the firm conviction that a mistake has been committed. *Carr v. Millar*, 86 Ark.App. 292, 184 S.W.3d 470 (2004).

Viewed in light of this standard, giving appropriate deference to the trial court's determinations of credibility, the record shows that appellant and L.G., A.M.'s mother, were both seventeen years old at the time of the hearing. Both were juniors at the same high school in Lewisville, Texas. Appellant began having sexual relations with L.G. as a freshman in high school. Their sexual relations were continuous and occurred at various locations, including the homes of their parents and friends. Appellant's mother was aware that appellant was taking L.G. into his bedroom, and they had sex there while appellant's mother was present in the home. Predictably, L.G. became pregnant in her freshman year of high school. At the urging of appellant's mother, L.G. terminated that pregnancy with an abortion. Appellant's mother paid $800 for the abortion.

The teens' mothers told them to stay away from one another, but appellant continued to have sex with L.G. at his mother's house. About six months after the abortion, L.G. became pregnant again. Turned out of her home by her mother because of this second pregnancy, L.G. moved into appellant's mother's home for three weeks. The teens slept in the same bedroom and continued to have sexual relations. They made no plans to get married. Appellant left the decision of what to do with the child to L.G.

L.G. left Lewisville, Texas, to visit her aunt and father in St. Louis, Missouri, during the Christmas season in 2007. While she was gone, appellant quarreled with his mother and was told to find somewhere else to live. Appellant's mother contacted L.G. as well and told her that she could no longer live in her house. L.G. was offered shelter by her aunt in St. Louis; she accepted the offer, and stayed there for the last two months of her pregnancy.

While in St. Louis, L.G. remained in contact with appellant. L.G. vehemently refused to consider a second abortion and discussed adoption with appellant by telephone. However, the telephone discussions and messages were ultimately terminated when appellant became increasingly abusive, calling L.G. a bitch, whore, baby-killer, and worse. Because the stress and anxiety from her contact with appellant was adversely affected L.G.'s health to the extent of requiring weekly medical treatment, L.G.'s aunt replaced her cell phone with a new one with a different number. Although L.G.'s aunt had herself been verbally abused by both appellant and appellant's mother, she gave her own telephone number to appellant's mother to enable them to remain in contact. Appellant's mother never called.

L.G. became increasingly interested in adoption after being forbidden to return to appellant's house. On her own initiative, she arranged for a meeting with an adoption service. She was given a package describing more than a dozen prospective adoptive couples. She selected a couple based on their values, met them for dinner, and was impressed by what a loving couple they were—so much so that, when she went into labor during the course of the dinner, she invited the adoptive couple to accompany her to the hospital birthing room. The adoptive couple has had custody of baby A.M. since her birth and, being Arkansas residents, filed this adoption petition in Benton County, Arkansas.

Relying on *In re Adoption of SCD*, 358 Ark. 51, 186 S.W.3d 225 (2004), appellant asserts that his consent to adoption was required because he "legitimated" the child by registering with the putative-father registries of Texas and Missouri. We find no merit in this argument.

At the time *In re Adoption of SCD* was decided, Ark.Code Ann. § 9–9–206(a)(2) provided that a father's consent to adoption was required only if (1) the father was married to the mother at the time the minor was conceived or at any time thereafter, (2) the minor is his child by adoption, (3) he has custody of the minor at the time the petition is filed, or (4) he has otherwise legitimated the minor according to the laws of the place in which the adoption proceeding is brought. The *SCD* court held that the father in that case had "otherwise legitimated" the child by registering with the Arkansas Putative Father Registry. However, the Arkansas General Assembly responded to *SCD* with Act 437 of 2005, entitled "An Act to Clarify the Law Regarding Adoption Consent and Subsidized Adoptions." [1] This Act struck the "otherwise legitimated" language from Ark.Code Ann. § 9–9–206(a)(2), replacing it with the specific requirements that, for consent to be required, the father must have a written order granting him legal custody of the minor at the time the petition for adoption is filed, or must prove that a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption was filed.[2] Since appellant had no written custody order before the petition to adopt was filed, the question on appeal is whether the trial court clearly erred in finding that appellant failed to prove he established a significant custodial, personal, or financial relationship existed with baby A.M. before the petition to adopt was filed. We find no error.

In common law, the putative father of an illegitimate child had no parental rights. *See Roque v. Frederick,* 272 Ark. 392, 614 S.W.2d 667 (1981). This rule was relaxed during the course of the twentieth century; in *Lipsey v. Battle,* 80 Ark. 287, 97 S.W. 49 (1906), the Arkansas Supreme Court suggested that the father of an illegitimate child had some duty to help rear and educate the child, and therefore had custodial rights inferior to those of the mother but superior to those of a complete stranger. In *Lee v. Grubbs,* 269 Ark. 205, 599 S.W.2d 715 (1980), the court expressly held that a father who had carried out his duties to support his illegitimate child should, if fit, have some preference over others if the unfitness of the child's mother required that a guardian be appointed. This was in keeping with *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), holding that the putative father of an illegitimate child had cognizable rights with respect to the child based on the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The extent of these rights was addressed in *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), which held that consent to adoption was not required of a putative father who never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child.

The scope of the due process rights afforded to the putative father of an illegitimate child was clearly defined in *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77

---

**1.** Vol. 1, Book 2 ACTS OF ARKANSAS 2005 at 1386; *see generally* Note, *The Confusion and Clarification of Arkansas's Adoption Consent Law,* 58 Ark. L.Rev. 735 (2005).

**2.** So that there would be no mistake as to its intent, the General Assembly in this Act also amended Ark.Code Ann. § 9–9–207 to expressly state that no consent to adoption is

required of a father who fails to prove he established a significant custodial, personal, or financial relationship with the child before the petition was filed, even if that father has signed an acknowledgment of paternity or is listed on the Putative Father Registry. Vol. 1, Book 2 ACTS OF ARKANSAS 2005 at 1388.

L.Ed.2d 614 (1983). The United States Supreme Court there held that a putative father had no due process right to notice of adoption proceedings, even though the mother knew that he actually filed an affiliation petition in another court, because the father could have received notice by mailing a postcard to the putative-father registry. The *Lehr* Court further held that the father's equal protection rights were not violated by being deprived of the privilege of vetoing the adoption because the father had not come forward to participate in the rearing of the child; by failing to assume any significant responsibility to the daily supervision, education, protection, or care of the child, or to complain about his exemption from such responsibilities, the father in *Lehr* failed to establish a relationship with the child similar to that maintained by the mother. The Court in *Lehr* explained that what a putative father has is not an established right but instead an inchoate one: the putative father has an opportunity to establish parental rights by performing parental duties.

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he "act[s] as a father toward his children." But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children as

well as from the fact of blood relationship."

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Lehr*, 463 U.S. at 261–62, 103 S.Ct. 2985 (internal citations and footnotes omitted). Ultimately, the court found that Lehr was not constitutionally entitled to notice of the adoption proceeding because he never established any "custodial, personal, or financial relationship" with the child. *Id.* at 267, 103 S.Ct. 2985. Because this is the precise language contained in Ark.Code Ann. § 9–9–206(a)(2) as modified by Act 437 of 2005, we must conclude that the General Assembly intended that putative fathers in Arkansas should be afforded no more rights with respect to their illegitimate children than those set out in *Lehr*, *supra*.

In light of these precedents, we cannot say that the trial court clearly erred in finding that appellant's consent to the adoption was not required. Although well aware of L.G.'s second pregnancy, appellant neither offered nor provided her support or prenatal care. He testified that he sometimes gave cookies to L.M. and that he was saving money for the baby under his mattress; appellant's mother testified that she allowed L.G. to live in her home for three weeks and that she spent $200 on the baby. We note that even these meager claims of support are

subject to considerable doubt; the testimony of both appellant and his mother was of questionable credibility, both being obliged to reassess several responses when presented with evidence of prior inconsistent statements. Furthermore, there was evidence that L.G. provided for her own support by performing housework and working two jobs during the three weeks she stayed at the home of appellant's mother before being told not to return. We do not agree with appellant's argument that he was prevented from contributing to the child's support because he did not know the address of the aunt with whom L.G. was staying in St. Louis. Appellant knew the aunt's name and had her telephone number; armed with this information, appellant could easily have determined the address. Moreover, appellant made no effort to locate L.G. by asking her mother about her whereabouts. Finally, appellant did not ask his mother to contact L.G.'s aunt at the telephone number that the aunt had provided to enable appellant to remain in contact despite his continuous verbal abuse of L.G. To the extent that appellant was not able to directly contact L.G. in the period immediately preceding A.M.'s birth, his dilemma was of his own creation insomuch as his contact with L.G. was limited because of his continued abusive harangues of her. Moreover, appellant's problem was not unique. Teenage pregnancies frequently result in animosity on the part of one of the parents. We agree with the explanation of a putative father's obligations under such circumstances offered by Judge Beier of the Kansas Court of Appeals:

> An unwed man who learns that his unwed sexual partner is pregnant and intends to carry the pregnancy to term has only one way to ensure he can exercise his parental rights after the birth, regardless of whether the mother intends to exercise hers: He must relinquish possession and control of a part of his property or income to the mother-to-be during the last 6 months of the pregnancy so that she may use the items or money to support herself or prepare for the arrival of the child. He must do this regardless of whether his relationship with the mother-to-be continues or ends. He must do this regardless of whether the mother-to-be is willing to have any type of contact with him whatsoever or to submit to his emotional or physical control in any way. The birth may be the event that triggers a legal obligation of support, but it marks the end of the period when voluntary support can preserve the father-to-be's right to raise his child. He who hesitates truly is lost, and a lawyer who advises otherwise commits malpractice.
>
> Even in the most acrimonious of situations, a father-to-be can fund a bank account in the mother-to-be's name. He can have property or money delivered to the mother-to-be by a neutral third party. He can—and must—be as creative as necessary in providing material assistance to the mother-to-be during the pregnancy and, the law thus assumes, to the child once it is born. He must not be deterred by the mother-to-be's lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant.

*In re Adoption of M.D.K.*, 30 Kan.App.2d 1176, 1182–83, 58 P.3d 745, 750–51 (2002) (Beier, J., concurring).[3]

---

**3.** In Arkansas, the father of an illegitimate child is responsible for lying-in expenses of the mother, person, or agency incurring them. Ark.Code Ann. § 9–10–110 (Repl.

We note that Judge Beier was discussing the situation faced by an unwed man. The present case is somewhat different because the appellant in this case is not a grown man, but is instead a minor. Under these circumstances appellant had another opportunity he could have grasped: He could have taken steps to transform himself from a dependent and immature boy[4] into an independent and mature man capable of performing the obligations and duties that arise from the parental relationship he sought to assert. The record demonstrates that he failed to do so. During the pendency of the case, appellant experienced repeated difficulties of his own making at school, including suspension for "persistent misbehavior." This was but one of five suspensions appellant incurred during the current school year. Appellant made no significant efforts to terminate his diagnosed alcohol and cannabis abuse or to obtain employment suitable to his age or capacity. His arrest immediately prior to the hearing for driving while intoxicated and leaving the scene of a crime[5] indicates that appellant has failed to develop sufficient judgment and maturity to enable him to control his own behavior, much less care for an infant. Appellant's vigorous assertion of parental rights in the absence of any demonstrated or potential ability to undertake parental responsibilities is consistent with his diagnosis of Narcissistic Personality Traits after psychiatric examination by Dr. Cara Hartfield.

His near-total self-focus and refusal to acknowledge his responsibilities are demonstrated by the facts leading to him (and L.G.) being turned out of appellant's mother's house: Appellant desired a $300 football helmet and asked his mother to buy it for him. She refused, citing increased expenses resulting from L.G.'s current residence in her home. Appellant told his mother that was "bullshit" and should not "count" because the expenditures were for L.G. and not for him.

With regard to his preparation for parental responsibilities, appellant admitted that he had spoken to no pediatricians or ministers, but claimed to have been reading a book about parenting he was given by "a lady [he] meet up with every Monday" at school. However, appellant could not recall the title of the book, stated that he knew nothing about separation anxiety, how to soothe an infant, assisting a child with language development, or about A.M.'s special medical requirements. Ultimately he conceded that he merely "tried" reading the parenting book "a long time ago," but then became "caught up with [football] practice and stuff."

Dispensing with an unwed father's consent to adoption does not violate equal protection when the putative father has done little or nothing to establish a parental tie with a newborn child. See Raymond v. Doe, 217 A.D.2d 757, 629 N.Y.S.2d 321 (1995). A biological fa-

---

2009). The main purpose of this and other filiation laws is to provide the putative father with an opportunity to assume his equitable share of responsibility for the child. See Taylor v. Finck, 363 Ark. 183, 211 S.W.3d 532 (2005).

4. Tellingly, when asked if he planned to marry L.G. if he gained custody of the child, appellant stated that he was "too young" to get married.

5. Around midnight approximately five weeks before the hearing, appellant, intoxicated, rear-ended another vehicle while driving a 2002 Mustang belonging to a friend. Appellant fled when the driver of the other vehicle approached, lost control of the car, and crashed into a brick wall, resulting in damages totaling $4,500, for which appellant is responsible. Appellant then fled on foot before being apprehended and arrested. Appellant requested that an attorney be appointed to defend him because he was indigent.

ther's opportunity to establish the parental tie by accepting substantial responsibility for the child's future begins at conception. *See In re Baby Girl Eason,* 257 Ga. 292, 358 S.E.2d 459 (1987). Appellant has complained vociferously regarding the deprivation of his asserted parental rights, but has been silent regarding his exemption from the parental responsibilities exercised by L.G., her aunt, and others. *See Lehr, supra.* Clearly, appellant had, but squandered, his opportunity to gain parental rights by assumption of parental responsibility; therefore, the trial court properly held that his consent to the adoption was not required.

▇ Although our holding that appellant's consent to adoption was not required is a sufficient ground for affirmance, there is another, equally valid reason for affirming the trial court in this case. The trial court found, in the alternative, that even if consent had been required, appellant unreasonably withheld his consent to the adoption. Ark.Code Ann. § 9–9–220(c)(3). We think that the trial court could properly make this finding because the record demonstrates that appellant was utterly incapable of caring for A.M. Appellant was an unemployed and immature teenager, still in high school, who planned to raise the child while simultaneously attending college. He testified, essentially, that he would allow his mother to raise the child for him for at least five years until he became sufficiently established to care for the child himself. However, it is well established that a parent cannot simply delegate his responsibility to provide care and support to a child to another. *In re Adoption of Glover,* 288 Ark. 59, 702 S.W.2d 12 (1986). Furthermore, by appellant's own admission, his mother's home was unstable and an unsuitable place to raise an infant. Appellant's mother is estranged from her own mother and all but one of her eight sisters. She had allowed her own boyfriends to stay there overnight despite the presence of appellant's young sister in the home, and had undeniably failed to provide suitable supervision for appellant. In addition to her failure to supervise, appellant's mother affirmatively permitted appellant to drive the family car, with the pregnant L.G. as a passenger, before appellant had qualified for his driving permit.

There was expert testimony that, in any event, appellant's plan to raise the child in concert with his mother while attending college would be harmful to the child. Dr. Hartfield testified that appellant's absence while away at college would adversely affect the child because sequential replacement of primary caregivers teaches children that they are not able to trust, and that children affected by this situation have problems developing healthy relationships later in life. There was also evidence that A.M. had special medical needs that were uniquely met by her adoptive parents. The child was born with a dangerous swallowing disorder, tracheomalacia, that causes problems ranging from food aspiration to tracheal collapse during feeding. As a result of this disorder, she has a restricted diet and must be fed in a specific manner with specific utensils. Normally, the parent of a child with this disorder requires extensive training. That is not presently necessary because the adoptive mother is an expert in the field, holding a Ph.D. with a specialty in pediatric swallowing disorders and motor development. In light of appellant's present inability to care for the child, the serious questions regarding the suitability of his mother's home for raising infants, the negative repercussions for the child of the only plan offered by appellant for her care, and the special ability of the adoptive mother to care for the child's special needs, we do not think that the trial court

clearly erred in finding that it would be unreasonable for appellant to withhold his consent to adoption.

Affirmed.

GRUBER, GLOVER, HENRY, and BROWN, JJ., agree.

VAUGHT, C.J., and HART, GLADWIN, and BAKER, JJ., dissent.

HART, J., dissenting.

The principal issue in this case is very simply whether the trial court erred in finding that X.T.'s consent to the adoption was not required because he failed to prove "a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption [was] filed." Ark.Code Ann. § 9–9–206(a)(2) (Repl.2009). I submit that the trial court made a mistake of law in concluding that X.T.'s consent was not required. I likewise believe that the trial court erred in its alternative basis for granting the adoption, i.e., X.T. unreasonably withheld his consent.

In virtually copying the appellees' supplemental statement of the case, the majority has focused on largely irrelevant facts.[6] It is not until the seventh page of the majority opinion that it gets to the crux of the matter, whether the trial court clearly erred in finding that X.T.'s consent

to the adoption was not required. It attempts to equate X.T.'s provision of only limited *prenatal* support and his failure to call L.G. after her aunt changed her cellphone number and banned him from calling as a failure to establish a relationship with his unborn child. Regarding the latter, it is preposterous to assert that one can establish any kind of relationship with a baby while it is in utero simply by calling its mother on a cell phone. As to the former, while lying-in expenses are recoverable after the birth of the child in a paternity action, Arkansas Code Annotated section 9–10–110 (Repl.2009), our probate code is completely devoid of that requirement as a prerequisite for being able to withhold consent to the adoption of one's child.

The majority's resort to a concurring opinion in a Kansas Court of Appeals case as the authority for its dubious conclusion that X.T. should have set up some kind of trust fund for his child if he wanted to preserve his parental rights is misguided in the extreme, and manifests a complete lack of understanding of Kansas and Arkansas law on this subject. In the first place, the concurring opinion in *In re Adoption of M.D.K.*, 30 Kan.App.2d 1176, 58 P.3d 745 (2002) (Beier, J., concurring), would not be mandatory, binding authority even if we were in Kansas, because it is

---

**6.** The majority suggests that X.T. should be disqualified from being a parent because he engaged in sexual activity outside of marriage. Their outrage is curious in this case in that, by definition, *all* putative fathers have had sex outside of marriage. The majority also points to X.T.'s use of crude language. Suffice it to say that if the use of crude language disqualified a man from parenthood, there are not enough courts in this country to handle all the adoptions. But most importantly, both of these facts are totally irrelevant.

The majority has called X.T. irresponsible, yet the mother, L.G., exhibited the same de-

gree of irresponsibility for conceiving the child. Remarkably, the majority also uses X.T.'s efforts to keep the baby as further proof of his irresponsibility, while at the same time using the mother's decision to give up the baby and even allow the appellees into the birthing room for the birth of the child as evidence that her decision to consent to the adoption was a sound decision. The majority ignores the fact that L.G. had something—a child—that the appellees wanted very much. I find nothing of significance in the fact that the appellees put their best foot forward.

only a concurrence. More importantly, however, the applicable portion of the Kansas adoption statute makes it mandatory for the court in an adoption proceeding involving an unwed couple to determine "whether the mother has received support payments or promises of support with respect to the child or in connection with such mother's pregnancy." Kan. Stat. Ann. § 59–2136(e)(5). No equivalent provision exists in Arkansas law. This misapplication of the law is compounded by the majority's failure to recognize that our supreme court requires trial courts to *strictly comply* with the formalities of our adoption statute. *Swaffar v. Swaffar,* 309 Ark. 73, 827 S.W.2d 140 (1992).

I do agree with the majority when it states that "the scope of the due process rights afforded to the putative father of an illegitimate child was clearly defined in *Lehr v. Robertson,* 463 U.S. 248 [103 S.Ct. 2985, 77 L.Ed.2d 614] (1983)." However, aside from the fact that X.T., like the father in *Lehr* did not have a relationship with his biological child prior to the filing of the adoption petition, the cases are radically different in terms of the relative opportunity for the fathers to establish such a relationship. The biological father in *Lehr* filed a petition to vacate the order of adoption of his child, who had been adopted when she was over two years old, by her mother's new husband. Conversely, the appellees in the instant case took the child from birth and spirited her away to Arkansas before X.T. was even informed of her birth. While the father in *Lehr* actually lived with the mother for a time after the child's birth, X.T. was never allowed to see his child. The difference is pivotal: in *Lehr* there was an opportunity squandered; in the instant case, we have an opportunity denied.

The majority's discussion of X.T.'s purportedly "abusive" telephone calls to persons other than his child are simply not relevant to the issue of whether he should have had the opportunity to establish a relationship with his child. As noted previously, barely two hours after the child's birth, the appellees took the child from Missouri and secreted her away in Arkansas. Had the majority been looking for guidance in the law rather than mere justification, however slight and spurious, for its position, I submit that it should have looked to our jurisprudence regarding stepparent adoptions and considered the circumstances surrounding X.T.'s involvement, or lack of involvement, in his child's life and found that his consent to the adoption was required by law.

With regard to whether X.T. "unreasonably withheld his consent to the adoption," I note that the majority has not cited any authority that defines this nebulous concept, nor made the effort to do so, beyond finding that a couple who were long past their child-bearing years, but financially and professionally well established, would make better parents than a young, natural father with a much less impressive employment history. I can only conclude based on today's opinion that henceforth "unreasonably withholding consent" can be determined by comparing bank accounts and resumes.

The majority has also impermissibly resorted to fact finding when it states that X.T. is "utterly incapable" of caring for his child because he planned to accept his mother's assistance while he attended college. In the first place, this finding ignores *In re Adoption of SCD,* 358 Ark. 51, 186 S.W.3d 225 (2004), where our supreme court held that a virtually identical plan constituted "taking significant steps to prepare for having the baby with [a putative father]." Secondly, there is no evidence in this record upon which anyone, including the trial court and this court,

could judge X.T.'s parenting ability because he had never been given so much as visitation with his child. I decline to engage in the rank speculation that the majority attempts to pass off as legal reasoning.

VAUGHT, C.J., and GLADWIN, J., join.

BAKER, J., dissenting.

The majority describes a difficult situation for unwed teenage parents, and the fortunate situation of a loving adoptive couple who were chosen by the mother in her decision-making process regarding her newborn infant. However, this case cannot be determined by examining the intimate details within the important process an unwed mother undertakes in her decision regarding the birth and care of her child. Neither can it focus on whether the putative father had established a substantial relationship with the child prior to the adoption proceedings. The issue before us is whether a putative father, who filed his notices of paternity in the state where the child was conceived, and also the state where the child was born, is entitled to notice.

The majority cites and relies upon *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), to support its position that a "putative father must establish an opportunity to establish parental rights by performing parental duties." The majority also agrees with a concurring opinion from a Kansas court that a putative father has only one way to ensure that he can exercise his parental rights after the birth of a child born outside of marriage, regardless of whether the mother intends to exercise her parental rights:

"He must relinquish possession and control of a part of his property or income to the mother to be during the last 6 months of the pregnancy.... The birth ... marks the end of the period when the voluntary support can preserve the father-to-be's right to raise his child." *In re Adoption of M.D.K.*, 30 Kan.App.2d 1176, 58 P.3d 745, 750 (2002)(Beier, J., concurring).

Significantly, in the Kansas case, the majority specifically noted that the unwed father failed without reasonable cause to support the mother in the six-months prior to the child's birth, and the father was not thwarted in his attempts to support the mother. In this case, the pregnant mother lived with the putative father until December 18, 2007, in Texas and gave birth on February 24, 2008, in Missouri. Even under the majority's parameters, appellant provided support to the mother within that six month period. Furthermore, it is unquestioned that he was thwarted in his efforts to contact and have the opportunity to establish his parental rights.

Under our concept of due process, that opportunity includes notice to the putative father. In *Lehr, supra,* relied upon by the majority, the Supreme Court held that where the putative father had never established a substantial relationship with his child, the failure to give him notice of pending adoption proceedings, despite the state's actual notice of his existence and whereabouts, did not deny the putative father due process or equal protection *since he could have guaranteed that he would receive notice of any adoption proceedings by mailing a postcard to the putative father registry.*

In this case, the father registered in the state of Texas [7] where the child was con-

---

7. Our supreme court has found that Arkansas courts' exercise of jurisdiction over a nonresident putative father would not offend traditional due process notions of fair play and substantial justice, and thus court had personal jurisdiction over putative the father in pa-

ceived and the state of Missouri[8] where the child was born. He, however, did not register in every other state of the union. As one scholar has noted:

> Putative father registries have generated a great deal of criticism. Critics argue that few men are aware of the registries or the need to register to protect their rights, women may conceal their pregnancy or misrepresent the situation, and filing with the registry in one state does not guarantee notice of an adoption in other state.

31 Hofstra L.Rev. 877, 898 (Spring 2003); *see also* Mary Beck, *Toward a National Putative Father Registry Database*, 25 Harv. J.L. & Pub. Policy 1031, 1039 (2002).

Due process is fundamentally about having a meaningful opportunity to be heard in a meaningful time frame. *Tsann Kuen Enters. Co. v. Campbell*, 355 Ark. 110, 129 S.W.3d 822 (2003). The notice requirements within the code vary according to the purpose of each statute; so long as the notice provided is "reasonably calculated" to apprise interested parties of the pendency of the action, the notice will pass constitutional muster. *Id.*

In this case, the putative father registered in two states to preserve his opportunity to develop a relationship with his child. The registry system is flawed when the adoption of a child is in a state for which the putative father has no notice. The majority's interpretation of our statute leaves a putative father, who has registered in other states based on information regarding his newborn child's significant contacts, with no meaningful opportunity to be heard in a meaningful time frame. That interpretation of the statute makes it constitutionally suspect. For that reason, I dissent.

VAUGHT, C.J., HART and GLADWIN, JJ., join.

---

ternity action; putative father was resident of Texas, which was state just to southwest of and bordering Arkansas, putative father was able to travel to Arkansas and back in same day, and State of Arkansas had interest in protecting its minor children and in ensuring payment of child support on their behalf. U.S. Const. amend. XIV; Ark.Code Ann. § 16–4–101(B)(Repl.1999); *Payne v. France*, 373 Ark. 175, 282 S.W.3d 760 (2008).

8. While the Missouri statute allows a scant fifteen days after the birth of the child during which the putative father can register, the Missouri legislature designed its statute with the built-in requirement that the public be informed about the PFR and mandated mechanisms such as public service announcements to be used so that the information could be widely disseminated. *See* Mo. Ann. Stat. § 192.016.7 (West 2004).