OPINION OF THE COURT
Susan M. Kushner, J.
Before the court is the issue of whether Brandon A. is a consent father in this adoption proceeding.
Facts
Melissa TT., the birth mother, is a 21 year old who resided in South Carolina from 2008 until March 2014. She and 24-year-old Brandon A. met in May 2013. They lived together in Myrtle Beach, South Carolina from August 2013 until approximately Valentine’s Day 2014. According to the testimony of both parties, although they broke up as a couple at the end of December 2013, they continued to have occasional sexual relations until the end of January 2014, and continued to share their two bedroom apartment. Both Melissa TT. and Brandon A. agree that she was on birth control pills throughout the entire time of their relationship. In the middle of February 2014, Brandon A. moved out of the apartment and in with two friends in Myrtle Beach.
The apartment complex sent an eviction notice in February 2014. Brandon A. worked out an arrangement whereby he would pay the rent in installments and ensure the apartment was vacated by the end of February. It is unclear where Melissa TT. went at that time. However, at some time in March 2014, being unemployed and unable to pay rent, Melissa TT. moved to New York City to reside with her grandparents. On March 19, 2014, she went to Planned Parenthood to have her birth control prescription renewed. Prior to a renewal, a pregnancy test was performed which, to Melissa TT.’s surprise, was positive. She was sent to Presbyterian Hospital for follow-up care, which she did on that same day. A “counselor” at the Presbyterian Hospital clinic gave her contact information for Friends in Adoption and she immediately called the agency.
Melissa TT. met with a caseworker for Friends in Adoption on the same day she found out that she was 35 weeks pregnant. Thereafter, Melissa TT. had contact one or more times per week with the caseworker until the day she delivered the infant Isabella on April 21, 2014.
*655 Approximately one week after Melissa TT. discovered she was pregnant, the caseworker gave her an intake form to complete. Melissa TT. identified Brandon A. as the birth father. The caseworker relayed that information to the case manager at Friends in Adoption. However, the caseworker acknowledged that her notes to the case manager did not include information regarding the birth father.
Melissa TT., with the assistance of the caseworker, chose the prospective adoptive parents. Melissa TT. sent emails to the prospective adoptive parents, including pictures of herself, in the last weeks prior to the birth of the child.
On April 21, 2014, the infant Isabella was born. Melissa TT. signed a surrender to Friends in Adoption two days later, on April 23, 2014, and on that same day, the infant was transferred to the prospective adoptive parents.
Approximately three weeks thereafter, on May 11, 2014, and again on May 19, 2014, Melissa TT. sent letters to Friends in Adoption revoking her surrender. The agency notified her that they would not honor her timely revocation and the child would not be returned to her.
On or after May 6, 2014, two or more weeks after the surrender was signed, Melissa TT. notified Brandon A. that she had delivered a baby girl and that she had given the child up for adoption.
Based on the above information, the court determined that a hearing on the issue of whether Brandon A. is a consent father was appropriate.
Procedural History
This matter initially came before the court because of the mother’s application to revoke her surrender to Friends in Adoption. The prospective adoptive parents then filed an adoption petition on May 28, 2014.
Brandon A. filed a paternity petition on July 22, 2014, and a custody petition on August 5, 2014. The paternity petition was resolved with an order of filiation after DNA tests and an admission.
Law
The Court of Appeals in Matter of Raquel Marie X. (76 NY2d 387 [1990]) held that Domestic Relations Law § 111 (1) (e) was unconstitutional. Domestic Relations Law § 111 (1) (e) is the *656 consent provision of New York’s adoption law pertaining to children less than six months of age. In Raquel Marie X., the Court of Appeals set forth guiding principles to be followed until such time as the legislature enacts a replacement statute {id. at 408). These guidelines, which remain in effect today, require this court to determine the following:
1. The father must be willing to assume full custody of the child;
2. The father must assert his rights promptly;
3. In addition, the court may consider whether the birth father:
a. Publicly acknowledged paternity;
b. Paid pregnancy and birth expenses;
c. Took steps to establish legal responsibility for the child;
d. Other factors evincing a commitment to the child. {Id. at 408.)
Considered
In reaching its conclusion in this matter, the court considered the testimony of: Melissa TT, the birth mother; Brandon A., the birth father; K.P., a friend of the birth father; J.W., a friend of the birth father; S.W., caseworker for Friends in Adoption; N.P., case manager for Friends in Adoption; and D.B., prospective adoptive parent.
The court took judicial notice of the following:
1. Motions for revocation — filed by the mother on May 22, 2014 (the mother sent two. One was sent to the agency on May 11, 2014, and the other was sent on May 19, 2014).
2. Adoption petition — filed by the prospective adoptive parents on May 28, 2014.
3. Paternity petition — filed by the father on July 22, 2014.
4. Custody petition — filed by the father on August 5, 2014.
5. Order Declaring Paternity — issued on September 24, 2014.
6. Affidavit of Father — notarized September 19, 2014.[1]
*657 The court accepted into evidence:[2]
1. Pictures of the mother’s abdomen at 35 weeks pregnant;
2. Pictures of the mother and her torso and/or abdomen taken between April 12 and 18, 2014;
3. Pictures of the mother taken between Halloween 2013 and January 2014;
4. Affidavit of the mother dated April 23, 2014;
5. Letter from Friends in Adoption to Brandon A. dated April 8, 2014.
Opinion
The issue in this case is whether Brandon A. is a consent father as contemplated under Domestic Relations Law § 111 (1) (e) upon consideration of the guidelines set forth in Raquel Marie X.
Here, Brandon A. filed a paternity petition approximately 2V2 months after being told he was a father and a custody petition approximately two weeks thereafter. Melissa TT. did not know she was pregnant until her 35th week and, by that time, had already moved to New York from South Carolina. The birth father continued to reside in South Carolina and had no physical contact with her after her move in mid-March 2014, or prior to the birth of the baby. The mother did not notify the father that she had delivered a baby until on or after May 6, 2014, two weeks after the baby was surrendered for adoption. While the birth mother continued to have cell phone contact with the birth father during that period of time, the only person she told prior to the birth that she was pregnant was her friend Grace S., who did not know Brandon A.
The relevant time period in this matter is the six months prior to the surrender of the child for adoption, that being from *658 October 24, 2013 to April 23, 2014. During that time period, Brandon A. did not know that the mother was pregnant. During the time he lived with Melissa TT., through mid-February 2014, he paid a majority, possibly as high as 90%, of their household expenses. He could not and did not pay any prenatal or hospital expenses because he did not know she was pregnant and, thus, was not aware of any.
Brandon A. filed a paternity petition about 2V2 months after being told that he was a father. The logistics of filing were not simple. Brandon A. lived in South Carolina, the child was born in New York City, and the petition needed to be filed in Albany, New York where the adoption was taking place.
There was no evidence that the father received notice of the pregnancy or of the adoption from the adoption agency. The only letter sent to Brandon A. by the agency was sent to an address where he never lived. Even if Brandon A. had received the letter, it would not have informed him where the adoption was to be filed or that he had a potential right to veto the adoption. The only information provided was that he was potentially the father of an unborn child of Melissa TT.’s and that he could “participate in the adoption plan” or sign an enclosed “Denial of Paternity statement.”
In this case, the main issue is what constitutes promptness and whether Brandon A. asserted his rights promptly. By all accounts, Melissa TT. did not know she was pregnant until the 35th week. This was testified to by Melissa TT. and the caseworker for Friends in Adoption. According to the caseworker, when she met Melissa TT. on March 19, 2014, Melissa TT. was “shell shocked,” having just found out she was pregnant.
Both the caseworker and the case manager for Friends in Adoption testified at length to what amounts to only minimal efforts to notify Brandon A. about Melissa TT.’s pregnancy and her decision to give the child up for adoption. They each testified, however, that Melissa TT. named Brandon A. early in the adoption process. However, despite having ample opportunity to discuss this important issue (the caseworker met with Melissa TT. at least once a week until delivery), the only other attempt besides sending a letter was an Internet search for Brandon A. The case manager testified that she found four people by that name on either the White Pages or Facebook. She made contact with none of them because she did not want to “invade Melissa’s privacy” by sending notice to the wrong *659 party. However, she never asked Melissa TT. for basic identifying information, such as his birth date, to determine which “Brandon A.” may have been the correct one.
In addition to the failed and flawed attempts by the agency to notify Brandon A., Melissa TT. failed to notify him that she was pregnant and had a baby until on or after May 6, 2014. This was at least two weeks after the birth and surrender of the child. Brandon A. filed a paternity petition approximately 10 weeks later.
“In an adoption proceeding by strangers, an unwed father who has been physically unable to have a full custodial relationship with his newborn child is also entitled to the maximum protection of his relationship, so long as he promptly avails himself of all the possible mechanisms for forming a legal and emotional bond with his child .... This implies, however, that in order to have the benefit of the maximum protection of the relationship — the right to consent to or veto an adoption — the biological father not only must assert his interest promptly (bearing in mind the child’s need for early permanence and stability) but also must manifest his ability and willingness to assume custody of the child.” (.Raquel Marie X, 76 NY2d 387, 402 [emphasis added].)
Since the requirement for “prompt” action by the father is a creation of the Court of Appeals, one must look to the case law for a determination of what it means.
In Matter of Robert O. v Russell K. (80 NY2d 254, 264 [1992]), the Court held that “[p]romptness is measured in terms of the baby’s life [and] not by the onset of the father’s awareness.” In Robert O., the birth father promptly filed once he became aware that the child existed and had been placed for adoption. By that time, however, and unlike the case at bar, the child had been with the adoptive parents for 18 months and it was 10 months after the adoption was finalized. At that time, the birth father’s petition was one to vacate the adoption and his petition was denied. In this case, at the time the father filed, the child had been with the prospective adoptive parents for approximately three months and the adoption has not been finalized.
In Matter of Seasia D. (10 NY3d 879 [2008]), the birth father learned that the birth mother was pregnant five months prior to the child being adopted. The mother was 14 years old and *660 the father was 17. The sexual contact between the birth parents was not consensual. During the six months prior to the adoption, the birth father did not provide any support for the mother and did not file any petitions for paternity or custody. The birth mother’s medical expenses were paid by Medicaid. The birth father was in school and not employed. The Court found that even if the birth father’s family’s actions of paying for some clothes were attributed to him, they were insubstantial. The Court of Appeals reversed the trial court’s and Appellate Division’s holdings that the birth mother’s extrajudicial consent was invalid due to duress and that the birth father was a consent father and reinstated the adoption petition.
Clearly, this case differs from Seasia D. Here, the birth father did not learn of the birth mother’s pregnancy until two weeks after the child was surrendered for adoption. By then, there were no prenatal expenses and the delivery expenses had been taken care of. However, he did support the birth mother during the relevant time period, from August 2013 until they finally separated in February 2014. During that time period, he paid the majority of the household expenses. While this birth father did not file paternity or custody petitions during the relevant time period, he could not have since he had no knowledge that she was pregnant. In fact, during five of the relevant six months, the mother’s credible testimony was that she also did not realize she was pregnant.
In Matter of Matthew D. (31 AD3d 1103 [2006]), the Appellate Division, Fourth Department, affirmed the Surrogate Court’s determination that the birth father was a consent father. Although the birth father apparently knew that the birth mother was pregnant, she did not tell him she was putting the child up for adoption nor at what hospital she was going to deliver. The birth father filed a paternity petition prior to the birth of the child but a custody petition outside of the relevant six-month time frame. In addition, the birth father did not pay any of the expenses in connection with the pregnancy and birth because the birth mother told him they were covered by Medicaid.
This case differs from Matthew D. in that the birth father here did not know until after the child was surrendered to the agency that the birth mother was pregnant or that she had delivered a child. This case is similar, however, in that the birth father did not pay the pregnancy or the birth expenses, although for different reasons. Here, because the birth father *661 did not know the birth mother was pregnant or had delivered, he was unaware of any expenses. In both cases, the birth father filed custody petitions outside of the relevant six-month time period. In this case, the birth father cannot be said to have filed in an unreasonable amount of time (2V2 months) given his not being told of the pregnancy, birth and surrender until at least two weeks thereafter.
In Matter of Jarrett (224 AD2d 1029 [1996]), the Appellate Division, Fourth Department, held that the birth father’s consent to the adoption was not necessary. The Court found that “[t]he birth father made no effort to assert his parental interest during the critical six-month period before the placement of the child for adoption, and thus had no constitutionally protected interest in retaining custody of the child” (id. at 1031-1032). “To a large extent, the failure of the birth father to know of the pregnancy was due to his own misconduct in assaulting the birth mother at the outset of her pregnancy.” (Id. at 1032.) Thereafter, an attorney told him to stay away from her. His alleged lack of knowledge was also suspect because he visited with the birth mother for four or five hours approximately one week before the birth.
Here, because even the birth mother did not know she was pregnant until 35 weeks into the gestation and the mother had moved from South Carolina to New York prior to her finding out she was pregnant, the birth father could not have known that she was pregnant. Therefore, he could not have made an effort to assert his parental interest prior to May 6, 2014, the earliest possible date it has been maintained he was made aware of that by Melissa TT. The difference from Jarrett is that in Jarrett, the birth father may not have known the birth mother was pregnant because he had been told to stay away from her due to domestic violence, whereas, here, the birth father had no knowledge due to no fault of his own.
In Matter of Baby Girl U. (224 AD2d 869 [1996]), while the birth mother placed the child for adoption without informing the birth father, the adoption petition was not filed until nine months after the child was placed for adoption. The father was informed of the adoption six months later, at which time he filed a paternity petition. The order of filiation was issued when the child was more than two years old and had been living with the prospective adoptive parents for 18 months. The Appellate Division, Third Department, affirmed the Family Court’s determination that the birth father was not a consent *662 father. While there was evidence that the birth father knew of the child’s birth at least by two weeks after the delivery, the Court held that the failure to “engage in any conduct indicative of a manifestation of parental responsibility” for 15 months after the child’s placement for adoption was too long. {Id. at 870.)
In Matter of Raymond AA. v Doe (217 AD2d 757 [1995]), the Appellate Division, Third Department, held that the birth father’s consent was not necessary where he knew the birth mother was pregnant but during the six months prior to the placement for adoption, he was consistently unemployed, spent more money than he was receiving on public assistance for beer, marijuana and LSD, and filed a paternity petition after being notified of a proposed adoption. The Court held that “manifestation of parental responsibility within the six months preceding the child’s placement for adoption” must include a judicial assessment of “any unfitness, abandonment or waiver” {id. at 760). The Appellate Division held that “based upon the factors set forth in Matter of Raquel Marie X. . . . the [birth father] was manifestly unable to assume custody of the child should custody have been awarded to him.” {Id. at 761.) Unlike Raymond, here, there was no evidence of inherent unfitness on the part of the birth father.
Returning to the question of whether the birth father asserted his rights promptly, the court must evaluate the unique facts and circumstances of this case.
In evidence are pictures of Melissa TT. taken during the relevant time period. With respect to those pictures taken on March 19, 2014, the day Melissa TT. found out she was pregnant, Melissa TT. testified that she took the pictures at the request of the adoption agency caseworker. The pictures were taken to show prospective adoptive parents how she looked when pregnant. In examining those pictures, the court finds they depict a young woman posturing to show herself in a pregnant pose and even that strikes this court as appearing four to five months pregnant, not eight months.
The credible testimony of the birth mother, the birth father, two of the father’s friends and the caseworker, as well as pictures in evidence, showed that the birth mother did not know she was pregnant until March 19, 2014, five weeks prior to delivery. The birth father testified that he lived in the same apartment with the birth mother until February 14, 2014. His two friends, K.R and J.W., testified that they saw both the *663 birth mother and the birth father two to three times per week until the day Brandon A. moved out of the joint apartment and neither noticed that she was pregnant or looked different in any way. K.P. and Brandon A. also testified that they saw Melissa TT. at her sister’s baby shower in early March 2014, prior to her moving to New York, and that she did not look in any way pregnant.
The mother credibly testified that she was advised by the caseworker that the adoption process would go more smoothly if she declined to identify the birth father and this was despite her early conversations with the caseworker identifying the birth father. The advice from the caseworker that the process would be easier if she declined to identify, was, according to Melissa TT., just prior to her meeting with the attorney, whom she was referred to by the agency.
In light of the unique facts and circumstances found to be present herein, the court determines that Brandon A. promptly petitioned for an establishment of paternity and his custody petition manifested a willingness to assume custody. Brandon A. provided the majority of support to Melissa TT. during the relevant time period. His failure to pay for pregnancy expenses or delivery expenses was due to no fault of his own, because he was unaware of her pregnancy or the birth.
Based on the above, the court holds that Brandon A. is a consent father in this adoption proceeding.

. The agency, at the close of proof and immediately prior to its closing argument, requested that the court take judicial notice of the affidavit of Brandon A., notarized September 19, 2014. Melissa TT.’s companion affidavit is in evidence. The court reserved on that issue. The court now finds that there is no prejudice to Brandon A. in taking notice of the affidavit because he testified to all of the matters set forth in the affidavit.

. The agency requested one other item be accepted into evidence, petitioner’s exhibit 5 (for identification only). That is an email sent by the caseworker for Friends in Adoption dated May 6, 2014, that was included in the agency’s case notes. The agency moved to have it admitted for the truth of the contents as a business records exception to the rule against hearsay. It was offered during the testimony of the case manager. The attorneys for Brandon A. and Melissa TT. objected to its admission on the grounds that it was outside the scope of the relevant time period, it contained triple hearsay and the person who sent the email had been a witness but was not the person being asked to authenticate it. The court sustained the objections on the grounds of triple hearsay and because the case manager was not the proper person to authenticate the contents of the email. (See on the issue of reliability of double hearsay Nucci v Proper, 95 NY2d 597 [2001].)